BYERLEY v. SUN CO.

(Circuit Court, E. D. Pennsylvania.  July 15, 1910.)

No. 201.

1. Patents (§ 328*)—Validity and Infringement—Asphaltic Petroleum
    Products and Process of Making Same.
        The Byerley patent, No. 524,130, for a process of making asphaltic
    products from the residuum of petroleum after distillation and for the
    product itself, called "Byerlyte," as a new article of manufacture, was
    not anticipated and discloses invention, the product being one of utility
    which has become widely known and used; also *held* infringed.

2. Patents (§ 289*)—Suit for Infringement—Defenses—Laches.
        The defense of laches to a suit for infringement of a patent *held* not
    sustained.
        [Ed. Note.—For other cases, see Patents, Dec. Dig. § 289.*
        Laches as a defense in suits for infringement, see notes to Taylor v.
    Sawyer Spindle Co., 22 C. C. A. 211; Richardson v. D. M. Osborne & Co.,
    36 C. C. A. 613.]

3. Trial (§ 39*)—Introduction of Evidence—Exhibits.
        Documents or other things produced by a witness on request in his
    cross-examination and marked for identification are not before the court
    as evidence, unless offered and admitted as such.
        [Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 92–98; Dec. Dig.
    § 39.*]

In Equity.  Suit by Francis X. Byerley against the Sun Company.
Decree for complainant.

W. K. Richardson and Harrison F. Lyman, for complainant.
Wm. L. Pierce and Augustus B. Stoughton, for respondents.

ORR, District Judge (specially presiding).  The complainant, who is
the inventor and owner, charges the defendant with infringement of
letters patent of the United States No. 524,130, dated August 7, 1894,
and issued to the complainant, Francis X. Byerley, for a process of
making asphaltic products and also for the products themselves.  The
bill is in the usual form, and prays the customary relief.  The de-
fenses in the answer are many, and such as have been urged in the
proofs or arguments will hereafter be considered in detail.

As stated by the patentee, the invention relates more particularly
to the manufacture of solid bodies from petroleum.  He says:

"In the manufacture of petroleum products, it has been customary to dis-
till the crude oil in externally heated stills, so as to drive off the naphtha and
the burning oil, with more or less of the heavier oils, leaving a residuum or
tar which can be further distilled, if desired, down to a solid body.  As the
distillation of petroleum residuum or tar has heretofore been commonly con-
ducted, it has resulted, when pushed to the production in the still of a body
which is solid in the still or which solidifies on cooling, in the formation of
a coke or a coke-containing pitch."

Again he says:

"In accordance with the present invention petroleum residuum or tar is
distilled down to a solid body by a prolonged exposure to a pitch-forming
noncoking temperature, say about six hundred degrees Fahrenheit (600°) F.,

more or less, with agitation and exposure to air or analogous gas or gaseous mixture. By this means, are produced black (or very dark brown) bodies readily soluble in petroleum naphtha, say benzine of 62° Baume, which the cokes or pitches heretofore made from petroleum, so far as I am aware, are not unless in comparatively small proportions. These bodies are believed to be new and are included in the invention as new articles of manufacture, as well as their process of production. They vary, according to the extent to which the process is pushed, in hardness at atmospheric temperatures (say at 60° Fahrenheit) from a rubber-like consistency to a mass of hardness and conchoidal fracture like the natural asphaltums (as for example Trinidad asphaltum and the so-called gilsonite from Utah). At a lower temperature the less hard bodies become harder and have a conchoidal fracture. The bodies melt at from about 200° Fahrenheit to about 400° Fahrenheit. The higher melting bodies, say those melting at from 350° Fahrenheit to 400° Fahrenheit, or in other words those which have been sufficiently freed from oil to have a drying quality, are well adapted to varnish-making, being employed in place of the natural asphaltum. These bodies may be used also for paving and roofing and analogous purposes to which natural asphaltums are applied, but in order to melt at the temperatures which workers in those industries have found convenient to use, it is necessary, as with Trinidad asphaltum, to employ oil or the like to render them sufficiently limpid at such temperatures; and it is better therefore for such uses to employ bodies of less hardness, which have sufficient oily matter present to melt at a convenient temperature."

The patentee then calls attention to the different compositions of crude petroleum from different localities, and says that, while he has successfully treated petroleum residuum proceeding from the ordinary distillation of Lima oil, yet it is intended by him "to include tar or residuum from other petroleum." Likewise, after describing his apparatus and an illustrative run with Lima tar, he says:

"It is also not to be understood that the temperature most advantageous for Lima tar is necessarily the most advantageous for other petroleum tar or tar other than petroleum tar; but from the illustration and working figures given those skilled in the art will be enabled to effect a useful result on other tars."

One further reference to the specifications is proper at this point. The patentee says:

"It is important in all cases to avoid a coking temperature, as the coke produced is not only itself an injurious ingredient in the asphaltum, but its formation indicates an alteration in the tar, or in bodies thereof, which it is desirable to avoid."

The claims of the patent alleged to be infringed are as follows:

"1. The process of making asphaltic products, by prolonged exposure of petroleum tar to a pitch-forming noncoking temperature in a still, with agitation of said tar, and exposure of the same to air, substantially as described.

"2. The herein described new asphaltic petroleum products, soluble in benzine, varying in hardness at atmospheric temperatures from a rubber-like consistency to a mass of a hardness and conchoidal fracture like the natural asphaltums, the less hard having also a conchoidal fracture at lower temperatures, melting at from about 200° Fahrenheit to about 400° Fahrenheit according to hardness, and in general having characteristics belonging to asphaltic residual products from a prolonged exposure of petroleum tar to a pitch-forming noncoking temperature in a still with agitation of said tar, and exposure of the same to air in contradistinction to previously known natural or artificial products of a more or less asphaltic character, substantially as set forth.

"3. The process of making asphaltic products, by prolonged exposure of petroleum tar to a pitch-forming noncoking temperature in a still, with exhaus-

tion of the products of distillation, agitation of the tar, and exposure of said tar to air, substantially as described.

"6. The process of making asphaltic or pitchy bodies, by prolonged exposure of petroleum tar to a pitch-forming temperature in a still, with agitation of said tar, and exposure of the same to air, substantially as described.

"7. The process of making asphaltic or pitchy bodies, by prolonged exposure of petroleum tar to a pitch-forming temperature in a still, with exhaustion of the products of distillation, agitation of said tar, and exposure of the same to air, substantially as described.

"8. The process of making asphaltic or pitchy bodies, by subjecting pitch-yielding tar to a pitch-forming noncoking temperature, with agitation of the tar, and exposure of the same to air, substantially as described.

"9. The process of making asphaltic or pitchy bodies, by subjecting pitch-yielding tar to a pitch-forming noncoking temperature, with exhaustion of the products of distillation, agitation of the tar, and exposure of the same to air, substantially as described.

"10. The process of distilling petroleum or pitch-forming oil (including tar), by heating the same in a still, with exhaustion of the products of distillation, agitation of the oil, and exposure to air, the temperature of said oil be gradually increased during the distillation to a pitch-forming noncoking temperature and continued at such temperature until a solid or product solidifying on cooling is obtained, substantially as described."

All of said claims, except claim 2, relate to the process. The process claims 1 and 3 are similar except for the provision in the latter that the products of distillation are "exhausted." Claim 6 differs from claim 1 in the use of the word "pitchy" and in omitting the word "noncoking," where reference is made to temperature. Claim 7 is the same as claim 6, with the addition of the "exhaustion" feature. Claim 8 differs from claim 1 in the use of the word "pitchy" and in referring to pitch-yielding tar instead of petroleum tar. Claim 9 is the same as claim 8, with the addition of the "exhaustion" feature. Claim 10 covers the process in which the product is made with oil rather than tar. The product claim (2) defines the "new asphaltic petroleum products," and brings in the process as characterizing the product.

To his product the complainant gave the name "Byerlyte," by which it became widely known and used. It was thought by some to be superior to the natural asphaltums and became widely used for making varnishes and waterproof roofing, and for other purposes. Its utility cannot be questioned by the defendant because the defendant is making in large quantities asphaltic products which are described in the Byerley specifications, but called by the defendant "Hydrolenes." Its Hydrolene "B" is the same as "Byerlyte."

The patentee's apparatus, as described by him, is simple. It consists of a closed still of usual construction with fire chamber below. Air pipes, open at both ends, extend from the top through, and nearly to the bottom of, the still. A goose-neck connects the vapor space of the still with an ordinary condenser which communicates by pipes with a receiver for condensed liquids, and an air pump at the upper part of such receiver. By means of the air pump a free flow of air is maintained through the bottom of the air pipes, and therefore through the contents of the still during the subjection of the contents to the prolonged heat. The apparatus used by the defendant is not widely different. It consists of a closed still with fire chamber below. An air pipe extends vertically nearly to the bottom of the still, and connects

with one or more horizontal air pipes which are perforated. A pipe connects the vapor space of the still with an air chamber, where condensation takes place. The defendant by an air pump forces the air through the vertical air pipe, through the horizontal pipes and through the perforations of the latter, and thereby a free flow of air is maintained through the contents of the still during the subjection to the prolonged heat. Here it is well to consider certain differences urged by the defendant against infringement.

Defendant's contention that there is no distillation in its process is not sustained by the evidence. Its argument, therefore, that there can be no still where there is no distillation, need scarcely be mentioned. The process is not for the purpose of distillation, but for the purpose of making asphalts. Distillation has already taken place in the treatment of the petroleum resulting in the residuum which is used by the defendant. There is then further distillation, to a greater or less degree, in the process of making the asphalt by the subjection of said residuum to a proper temperature, and by its exposure to and agitation by air. Defendant also insists that there. is no infringment because it does not use the same temperature as is expressed by the patentee. This is not tenable because the patentee expressed a wide range of temperatures suitable to tars or residuum of petroleum of various kinds from various localities. His caution was that the temperature should be "pitch-forming noncoking." Defendant also insists that there is no infringement because it forces the air through the pipes into the bottom of the still, instead of drawing the air into the still by means of an exhaust pump, as does the complainant. It plainly appears from the evidence that there is no substantial difference in carrying out the process whether the air is drawn or blown through the charge in the still. The one method is the equivalent of the other. Indeed, it appears to the court that every variation by the defendant in apparatus or process is the equivalent of something described by the patentee.

The defendant further insists that Byerley's claims are met by the prior art. The burden of proving this has not been sustained by the defendant. Many patents were cited to that end. Some had the idea of producing asphalt from petroleum residuum, but by mixing with it sulphur, permanganate of potash, or some other chemical. United States Patent to Jenney, No. 178,061, dated May 30, 1876, was specially dwelt upon at length. His raw material was "sludge oil," a waste product obtained in a certain process for the purification of hydrocarbon oils, containing both carbon and sulphur as well as sulphuric acid. The purpose of the process, as set forth in Jenney's patent, was to manufacture a residuous substance. The chemical constitution of the Jenney products is different from those of the complainant and defendant. There are physical differences between them, also, which may be easily observed. Moreover, the evidence of Jenney's prior use of his product is unsatisfactory and unconvincing. If there were such use, it was not successful and ceased many years before the plaintiff's product discovered. As further bearing upon the prior art, satisfactory oral testimony shows that prior to the introduction of "Byerlyte" no artificial asphalt was known to commerce. The

court is satisfied that there is not a prior patent or prior use relating to the production of asphaltic products from petroleum simply by the prolonged exposure to high temperature and the action of air. The utility and novelty of complainant's product and process being established, and infringement having been found, he is entitled to a decree unless the defense of laches be good. That there has been considerable delay is clear. It has not, however, been unexcused. The defendant called the complainant, Francis X. Byerley, and his son, Francis A. Byerley, as witnesses, and thereby declared that they were credible. It could not therefore impeach their testimony, and cannot now declare them to be unworthy of belief. Dravo v. Fabel, 132 U. S. 487, 10 Sup. Ct. 170, 33 L. Ed. 421. On July 20, 1903, one Ellis an assistant manager of the defendant wrote to complainant:

"We have a refinery here for refining Texas oil, and we are anxious to try blowing some of the residuum with air. The residuum stands about 450 fire test, and we would like to blow it at say 400°. Would it be safe to blow this in one of our 800 barrel stills such as we are using for distilling the crude?"

To this complainant replied on July 23d following:

"As to blowing oil or residuum when heated, I think the best information I can give you is that this process forms the basis and is covered by a patent which I hold and which we are using here. We have used it very successfully on Texas oil also. Of course, we would deprecate any infringement of the patent, and advise you of it, to avoid difficulties. Should you wish to use the patent I should be glad to hear from you."

Subsequently complainant by suggestions in correspondence and interviews tried to induce defendant to take an interest in his patent. In November, 1903, Francis A. Byerley, the son, visited defendant's plant, and asked the assistant manager, Ellis, if they were using air for making asphalt. He replied that they were not. At that time an air blower had been partially, if not completely, installed. Ellis himself does not directly deny this. Again, in the summer of 1904, Ellis told the same witness, Byerley, that they were not using air. Complainant had a right, therefore, to assume that defendant was mindful of his rights and claims under his patent. He first saw a sample of defendant's Hydrolene in the spring or summer of 1907. Up to that time he had no reason to suppose the defendant was infringing his patent. It is perhaps unnecessary to refer to the pecuniary embarrassment due to the burning of the complainant's plant and the rebuilding of same from which he was not relieved until October, 1908. Complainant, after seeing defendant's product, deemed it necessary to put detectives in defendant's plant. These reported in the fall of 1908. The bill was filed soon after. The complainant has not been guilty of laches.

Another matter must be considered. Upon cross-examination, defendant's expert was requested to produce "all correspondence, reports, notes, diaries, or other written expression, concerning in any wise matter" to which he had testified. He produced 34 different things, and had them marked for identification. Many of these were said by him to be the products of laboratory work. While these products were not offered in evidence, yet defendant now insists that they are in evidence, although the time for rebuttal testimony in regard to them has

long passed. Because they were included in response to the request is no reason why they are before the court. It might perhaps have been defendant's privilege to refuse their production or at least to refuse to permit their inspection unless they were received as evidence. Not having so refused, and not having offered them, the defendant cannot now make them self-serving indicia of the industry of its expert. It is unfortunate, perhaps, for defendant that its expert did not at least appear to be disinterested. His zeal for the defendant (whom in correspondence he called his "client") in efforts to procure witnesses and on the witness stand indicated a bias to support the cause upon which he had embarked, and lessened the value of his evidence.

The complainant is entitled to relief. Let a decree be drawn in accordance with this opinion.