## BYERLEY v. BARBER ASPHALT PAVING CO.

(District Court, S. D. West Virginia. February 18, 1916.)

### No. 470.

1. PATENTS ⚭44—ANTICIPATION—ACCIDENTAL PRODUCTION OF PATENTED PRODUCT—"NOVELTY."

"Novelty" is not negatived by the prior accidental production of the same thing, when the operator does not recognize the means by which the result was accomplished, and no knowledge of it is derived therefrom by any one.

[Ed. Note.—For other cases, see Patents, Dec. Dig. ⚭44.

For other definitions, see Words and Phrases, Second Series, Novelty.]

2. PATENTS ⚭328—VALIDITY AND INFRINGEMENT—PETROLEUM ASPHALT.

The Byerley patent, No. 524,130, for a process of making asphaltic products from petroleum tar, and for a new asphaltum petroleum product, was not anticipated, discloses invention, and is entitled to a liberal construction both as to process and product claims. Claim 2, for the product, described as "varying in hardness at atmospheric pressure from a rubber-like consistency to a mass of a hardness * * * like the natural asphaltums," is sufficiently broad to embrace such products as are solid as distinguished from liquid and as exhibit a rubber-like consistency. Both classes of claims, also, *held* infringed.

In Equity. Suit by Francis A. Byerley, as executor, trustee, and individually, against the Barber Asphalt Paving Company. On final hearing. Decree for complainant.

W. K. Richardson and Harrison F. Lyman, both of Boston, Mass., for plaintiff.

Henry N. Paul, Jr., of Philadelphia, Pa. (Fraley & Paul, of Philadelphia, Pa., on the brief), for defendant.

KELLER, District Judge. The complainant, as executor of and trustee under the will of his father, Francis X. Byerley, and individually as legatee under said will, instituted this suit claiming infringement by the defendant of letters patent of the United States No. 524,-130, granted to said Francis X. Byerley, August 7, 1894, upon an application filed April 28, 1893, for process and product for the manufacture of asphalt, and other products from petroleum.

The claims alleged to be infringed by the process and product of the defendant and by its use of products manufactured by others are claims 1, 2, 3, 6, 7, 8, and 9, which are described in the patent in suit as follows:

"1. The process of making asphaltic products by prolonged exposure of petroleum tar to a pitch-forming noncoking temperature in a still, with agitation of said tar, and exposure of the same to air, substantially as described.

"2. The herein described new asphaltic petroleum products, soluble in benzine, varying in hardness at atmospheric temperatures from a rubber-like consistency to a mass of a hardness and conchoidal fracture like the natural asphaltums, the less hard having also a conchoidal fracture at lower temperatures, melting at from about 200° Fahrenheit to about 400° Fahrenheit according to hardness, and in general having characteristics belonging to asphaltic residual products from a prolonged exposure of petroleum tar to a pitch-forming noncoking temperature in a still with agitation of said tar

and exposure of the same to air in contradistinction to previously known natural or artificial products of a more, or less asphaltic character, substantially as set forth.

"3. The· process of making asphaltic products, by prolonged exposure of petroleum tar to a pitch-forming noncoking temperature in a still, with exhaustion of the products of distillation, agitation of the tar, and exposure of said tar to air, substantially as described."

"6. The process of making asphaltic or pitchy bodies, by prolonged exposure of petroleum tar to a pitch-forming temperature in a still, with agitation of said tar, and exposure of the same to air, substantially as described.

"7. The process of making asphaltic or pitchy bodies, by prolonged exposure of petroleum tar to a pitch-forming temperature in a still, with exhaustion of the products of distillation, agitation of said tar, and exposure of the same to air, substantially as described.

"8. The process of making asphaltic or pitchy bodies, by subjecting pitch-yielding tar to a pitch-forming noncoking temperature, with agitation of the tar, and exposure of the same to air, substantially as described.

"9. The process of making asphaltic or pitchy bodies, by subjecting pitch-yielding tar to a pitch-forming noncoking temperature, with exhaustion of the products of distillation, agitation of the tar, and exposure of the same to air, substantially as described."

Of these claims, No. 2 is for products, and all the rest are process claims.·

In view of prior litigation involving this patent in which its validity was sustained by the Circuit Court of Appeals for the Third Circuit in the case of Francis X. Byerley v. Sun Company, 184 Fed. 455, 106 C. C. A. 537, all defenses set up in the answer of this defendant have been tacitly or expressly abandoned, except two, namely, anticipation and noninfringement, and no references in support of these defenses which were properly urged in the case against the Sun Company and were overruled by the decision in that case are insisted upon or relied upon in the brief of defendant filed before me, in which the defenses here relied upon are stated as follows:

I. The patent in suit is invalid by reason of the prior patenting and publication of the same invention to one John M. Sparrow, in Canadian letters patent No. 35,117, dated October 2, 1890, and an accompanying publication describing the same invention read by David Douglas before the American Gaslight Association in the year 1891, and published in the printed proceedings of that society in September, 1892.

II. This defendant does not infringe upon the claims of the patent in suit, which are specifically limited to the employment of the process described therein for the manufacture. of a "solid body" or "pitch" having a consistency precisely defined in the specification; whereas, this defendant has employed its process in the manufacture of much softer bodies, not within the terms of the claims which are limited to the harder bodies both in terms and of necessity because the use of such process for the production of semisolid or viscous bodies like those manufactured by ·defendant had long been known.

### The Sparrow Patent.

Before proceeding to a discussion of this defense, it may be well to call attention to an apparent error in the stated defense.

From the proofs it does not appear that any statement describing the Sparrow patent was·made by David Douglas, and published by the

American Gaslight Association, but that W. H. Pearson, Jr., who was superintendent of the Consumers' Gas Company of Toronto, explained a process being used by "parties in Toronto," which may or may not have had reference to the Sparrow process. In any event, it can scarcely be contended that the process described by Mr. Pearson is full enough to serve as an anticipation of Byerley's patent under the provisions of section 4886, R. S. (Comp. St. 1913, § 9430).

As to the Sparrow patent itself, it must stand or fall as an anticipation by the adequacy or inadequacy of the description therein contained to acquaint one skilled in the art with the process which is so circumstantially described and claimed in the Byerley patent.

It seems to me that a simple reading of the Sparrow patent is sufficient to demonstrate that the specifications fall far short of that full and clear description that alone can serve as an anticipation of a duly granted United States patent. Sparrow says that his invention consists of a new and useful process for "separating or driving out the water and volatile matters from the refuse or tar resulting from the manufacture of illuminating gas from petroleum oil, and thereby reduce it to densities suitable for roofing paint, roofing and paving pitches, and for other purposes."

There is here not only no suggestion of the appreciation of a chemical change induced by the process described, but, on the contrary, the idea of such change is expressly negatived by the statement that his process is one for the separating and driving out the water and volatile matters, and no suggestion whatever can be indulged that Sparrow ever had in mind a change in the material used by him other than that involved in "driving out the water and volatile matters." This material (water-gas tar) was a very different material than that commonly used in the Byerley process, and contained as much as 40 per cent. of water, and it was, of course, necessary in order to use this refuse to drive off this water, and I think it is apparent from his whole patent that Sparrow himself never appreciated the fact that his hot air, at whatever temperature applied (as to which his specifications are silent), ever had any effect on his material other than that of "driving out" volatile matters.

[1] The fact that the air as used in the Sparrow process may, or must, have had the same effect as in the Byerley process, is far from conclusive of anticipation, for it is settled law that novelty is not negatived by a prior accidental production of the same thing, when the operator does not recognize the means by which the result is accomplished, and no knowledge of it, or of the methods of its employment, is derived from it by any one. Pittsburgh Reduction Co. v. Cowles Electric Smelting & Aluminum Co. (C. C.) 55 Fed. 307 (in which case, see Judge Taft's statement of this principle); Chase v. Fillebrown (C. C.) 58 Fed. 377; Wickelman v. A. B. Dick Co., 88 Fed. 266, 31 C. C. A. 530; Tilghman v. Proctor, 102 U. S. 711, 26 L. Ed. 279; Topliff v. Topliff et al., 145 U. S. 161, 12 Sup. Ct. 825, 36 L. Ed. 658.

Moreover, it appears from the testimony in this case that it is by no means true that any application of air to tar will result in its change into the artificial asphaltic products of Byerley's process.

These results, under the testimony, are dependent upon conditions affecting temperature, time, apparatus, and air quantities. Defendant's expert, Mr. Forrest (Complainant's Record, pp. ——, Q. 17–20), described a process of defendant "only for the purpose of removing moisture in the residuum and of mixing the materials," the air being blown from six to ten hours to a day or two, and as to this process he swears (C. R. R. A. Q. 250–252) that the air does not operate to modify the character of the mass (material) in any respect.

[2] I reach the conclusion that neither the Sparrow Canadian patent No. 35,117, nor the statement of Mr. W. H. Pearson, Jr., published in the proceedings of the American Gaslight Association in September, 1892, constitute an anticipation rendering the patent in suit invalid.

In this connection, I might say that the file wrapper in Byerley's application is in evidence, and the office correspondence abundantly shows that Byerley strenuously contended (as indeed I think his specification and claims also assert) that his process worked a chemical change in the constituents of the materials used. That it in fact does so is not only not denied, but is admitted by all the expert witnesses, and that Sparrow had no idea of any such change appears to be clear from his own words.

### The Defense of Noninfringement.

It is strenuously claimed by the defendant that some, if not all, of its own products which are the subjects of suit do not infringe the claims of the Byerley patent because the Byerley process is limited to the manufacture of asphaltic products having a precisely defined solidity much in excess of defendant's products.

It is true that, in lines 13 to 15 of his specifications, Mr. Byerley says, "This invention relates more particularly to the manufacture of solid bodies from petroleum," but he goes on in the same paragraph to say, "but each of the improvements constituting the same is included for all the uses to which it may be adapted.".

It thus appears that for limitation of the several process claims light must be sought in the language of the claims themselves, and the descriptive part of the patent, to wit, the specifications, must be read as merely illustrative unless the clear intent to limit the claims necessarily appears therefrom.

Similarly, the product claim No. 2 is to be interpreted in accordance with its language, and it is entirely conceivable that such claim might be confined by its own language within limits to which the process claims, or some of them, might not be subject.

In the first place, the process patented and claimed by Byerley is described in his patent and is shown by the testimony to be a progressive one, continued for varying lengths of time, but in any case for a considerable period after the materials have been brought to a temperature at which changes described in the specification begin to take effect. Therefore it would seem that, conceding the validity of the patent, it should be liberally construed, with only such limitation upon it as is made necessary by the claims themselves, or the necessary implications arising from the language used in them.

Therefore, in construing the language of the product claim (No. 2) in reference to the degree of hardness of the patented asphaltic products, the expression "varying in hardness at atmospheric temperatures from a rubber-like consistency to a mass of a hardness and conchoidal fracture like the natural asphaltums," while doubtless not covering truly viscous products, the language should be construed as embracing such products as are "solid," as distinguished from "liquid," and exhibit a "rubber-like" consistency regardless of whether they exhibit the same, a greater, or less degree of penetrability under test. I know of no reason why the further distinction between "solids" and "semisolids" should be sought to be drawn, as Byerley was distinguishing these products from previously known artificial asphaltic products, none of which, so far as I am aware, or as has been shown in testimony, bore any other form than that of a thick viscous liquid.

"Rubber-like consistency," as used by Byerley, in my judgment refers quite as aptly, and more so, to the peculiar elasticity of that material, than it does to its penetrability, as elasticity is the peculiar quality of rubber, and this quality is possessed by each and all of defendant's alleged infringing products, and they are each and all "solid" as contradistinguished from even a "viscous" liquid.

With reference to the process claims, I do not find that those in suit are so limited that it can be said that none of them are infringed by each and all of the defendant's processes. They were all made the subjects of lengthy arguments and discussion in the Patent Office, as is shown by the file wrapper (in evidence by stipulation of counsel in this case), and were all allowed as exhibiting distinct differences in the extent of claim and method of statement.

I call especial attention to the language of claim No. 8, which seems very wide in scope, as the process is not limited either as to duration or as to apparatus, and includes as well the use of defendants "kettle" as of complainants' "still"; the only limitation being that it is a process of making "asphaltic or pitchy bodies" by the means set forth in the allowed claim, and I construe this limitation as including any product so produced having a "body" as distinguished from a liquid, and so construed each and all of defendant's products infringe this claim.

Upon the general features of the utility and novelty of the Byerley invention, I do not see any reason to enlarge. They have been referred to in the opinions of both the District Court (181 Fed. 138) and the Circuit Court of Appeals (184 Fed. 455, 106 C. C. A. 537) in the case of Byerley v. Sun Company, and I fully agree with those opinions as herein indicated in my view of the proper interpretation of this patent.

I, accordingly, hold that both "hydrolene B" and "obispo refined asphalt," the purchased products used by defendant and referred to in the evidence, as well as defendant's first, second, and third processes, and the products thereof, are infringements of the patent in suit, and that complainant is entitled to relief, and a decree for an accounting may be drawn.