## STANDARD ENVELOPE SEALER MFG. CO. v. GRAYWOOD MFG. CO.

(District Court, D. Massachusetts. March 17, 1922.)

No. 1070.

1. **Patents ⬤23—Omission of step in process invention.**

It is invention to omit, from prior process, step which those skilled in its performance considered essential, but which inventor proved to be useless.

2. **Patents ⬤37—Prior accidental production does not negative novelty.**

Novelty is not negatived by prior accidental production of same thing, when operator does not recognize means by which accidental result is accomplished, and no knowledge of them, or of method of employment, is derived from prior use by any one.

3. **Patents ⬤23—Not invention to omit parts, unless omission causes new mode of operation.**

It is not invention to omit one or more parts of machine or manufacture, unless that omission causes new mode of operation of parts retained, though reconstruction of machine, so that less number will perform all functions of greater, may be invention of high order.

4. **Patents ⬤328—1,365,803, claims 10 and 11, held valid and infringed.**

Patent No. 1,365,803, claims 10 and 11, for an envelope sealer without any pressure plate, roller, or other mechanical device to press flap against envelope, *held* valid and infringed.

5. **Patents ⬤328—1,365,803, claim 3, held not infringed.**

Patent No. 1,365,803, claim 3, relating to envelope sealer, *held* not infringed.

In Equity. Suit by the Standard Envelope Sealer Manufacturing Company against the Graywood Manufacturing Company. Decree for complainant.

Franklin F. Phillips, Jr., of Boston, Mass., for plaintiff.

Horace Van Everen, of Boston, Mass., for defendant.

ANDERSON, Circuit Judge. After a fairly long trial, this patent infringement case has come down to a pretty narrow main issue: Are claims 10 and 11 invalid by reason of prior public use made or caused by the plaintiff itself? A minor issue as to infringement of claim 3 is also presented.

Claims 10 and 11 cover, broadly, an envelope sealer without any presser plate, roller, or other mechanical device to press the flap against the body of the envelope after it is moistened. In lieu of such pressure, applied by various forms of mechanical devices in practically all the prior art, the plaintiff's patent contemplates projecting the moistened envelopes into a metal receiver, where, by stacking and the natural action of the moisture on the gum and the paper, the contact of the flap with the body of the envelope and resultant firm sealing will be effected.

This is a valuable new step in the envelope sealing art. Defendant's attack upon the validity of claims 10 and 11 requires a brief statement of the relations of the parties and of the development of the plaintiff's machines.

The plaintiff's corporation was organized in October, 1913, for the purpose of manufacturing and selling an envelope sealer invented by its president or chief executive, Storck. This patent, No. 1,194,568, dated August 15, 1916, on an application filed October 13, 1913, covers a combination machine, in which envelopes are fed from a stack successively over a rubber conveyer into contact with means for raising the flaps, moistening the flaps, "and then pressing the flaps against the envelopes, thus sealing

them." It thus, like other devices of the prior art, contemplated sealing by pressure provided by the machine itself. It included no receiving stack, and none was sold with the earlier machines. So far as the earlier machines were concerned, the envelopes might have been projected helter-skelter into a round basket or upon a table. But after a considerable number of these machines, models F and C, had been sold, it was found that a receiving rack would add to the convenience and utility of the machine. Obviously, to collect the envelopes into a stack, easily grasped by the hand of the operator, would save time and increase operating efficiency. Accordingly, for more than two years prior to the application for the patent in suit, the plaintiff furnished with its old machines, models F and C, receptacles made of three pieces of sheet metal, with a recess in the front edge to receive the fingers or thumb of the operator, and with feet so arranged as to tip it rearwards, and thus receive and arrange an orderly stack of discharged envelopes. On this rack were directions, the part of which now material is as follows:

"Sealing. Place this rack at end of machine in a position corresponding to size of envelope (see cut); *this is important* for envelopes feed through the machine too fast to allow sufficient time for glue to be in its best sticking condition. Hence sealing is not completed until the envelopes are stacked in this receptacle and a quick hand pressure applied. Then remove the stack and lay it on a table flap side down. If this instruction is observed, and the wick kept clean, we guarantee perfect results."

Shortly stated, the defendant's contention is that the old machine, plus this sealing stack, as used in accordance with the directions put out by the plaintiff, was the full equivalent of the new device. In other words, that in actual operation, the sealing plate on the old machines, models F and C, was functionless; the actual sealing, as plaintiff contends, being largely, if not entirely, done in the receiving rack. But the evidence shows, and I find, that the old machine, without the rack, would effectively seal a large proportion of the envelopes; that is, the pressure applied by the machine itself would bring the moistened flaps into such contact with the envelopes that they would adhere, pending sufficient penetration of the gum by the moisture, so that softening and then hardening—which is the real sealing process—would take place.

It is also clear that, if the machine was operated very rapidly, particularly on envelopes well filled, the almost instantaneous pressure of the sealer plate would not alone be sufficient to effect sealing. The directions recognize this situation. The important language is: "Hence sealing is not *completed* until the envelopes are stacked in this receptacle and a quick hand pressure applied." The word "completed" shows clearly the view then held of the relative importance of pressure from the sealing plate and time in the stack.

But neither the directions nor the actual use of the machine contemplated sealing without any pressure from the machine itself. On the contrary, the stack was regarded as supplementing, or assisting, in the completion of the sealing, not as furnishing an effective and complete substitute for pressure originating from the mechanical device.

I turn now to the genesis of the patent in suit [No. 1,365,803, issued January 18, 1921]. In 1917, the plaintiff's business had become so substantially and commercially developed that larger models were desired, including one for power operation. Storck at that time planned a larger and swifter machine, and provided for a heavier sealing plate, on the assumption that a larger and swifter machine would call for increased pressure. But, when he came to operate his new model at the increased speed, he found it very unsatisfactory, in that the sealing plate had practically no effect in sealing envelopes; the envelopes would frequently drop into the hopper with their flaps wide open. It then, for the first time, occurred to Storck that what really causes sealing is not *heavy* pressure, but slight pressure, to hold the flap in contact with the body of the envelope during the time—perhaps thirty seconds—requisite for the moisture to soften the gum and then to harden by drying.

Consequently Storck made a new machine, with a shorter conveyer and no presser plate or roller. But he provided, as a part of his new machine, a receiver "located immediately adjacent to said flap moistening means to collect the envelopes successively in a self-sealing stack for the purpose specified." See claim 10.

In this connection, a statement of the essential facts in the sealing process is pertinent.

It appears from the interesting testimony of Mr. Kent, the plaintiff's expert, that the effect of dried gum upon the under side of the flap of an envelope is to contract or curl the flap so that it is concave. When this

gum is moistened and hence expands, perhaps, also, as the moisture strikes through the gum to the paper, the inner side of the flap itself expands, so that the flap will gradually lose its curl, straighten, and even become, on the lower side of the flap, convex. As it dries, it of course tends to resume its concave form.

The problem of sealing is, therefore, in its main aspect, to give sufficient time for the moisture to effect its softening and flattening processes, the flap meantime being kept or brought into contact with the body of the envelope, so that when drying takes place the gum will be adherent to both the flap and the body of the envelope. Obviously, pressure sufficient to make and keep such contact is enough.

The application for Storck's new device was filed on March 28, 1918. In the specification of the application as originally filed, his new conception was fully disclosed, inter alia, in the following:

"I am aware that it has been the common practice to provide means intended to positively seal the envelop flaps by pressing the moistened flap against the back of the envelope as it passes through the machine. This has been accomplished by means of passing the envelope beneath a sealing plate or between opposed sealing rollers. I have found, however, that such means may be eliminated, as a brief interval of sealing pressure, as when the envelop is passing through the machine, is never sufficient to effectively seal the flap, there being required for this purpose a more prolonged contact between the gummed flap of the envelope and the back thereof in order that the moistened gum may be afforded an opportunity to penetrate the paper and dry. Hence I have provided for actual sealing in the receiving hopper where the envelops are stacked with moistened flaps for a sufficient interval to permit the weight of the stack to hold the flaps in engagement with the backs of the envelops until the latter are effectively sealed."

But claims specifically covering this new conception were not embodied in the original application. The evidence shows, and I find, that counsel found difficulty in framing claims so as to cover clearly in a patent for a machine the elimination of the sealing plate. The idea was in one aspect negative. Possibly in one aspect the new concept was for a process rather than for a device. At any rate, counsel filed the application, intending, after conference with the officials in the Patent Office, to amend so as to cover

specifically the new invention of a sealer which effected sealing without any pressure on the moistened envelopes derived from the mechanical device itself. Such amendment was made in April, 1920, the most important parts of which are found in claims 10 and 11, as follows:

"10. In a device of the character specified the combination of a feeding means to support and forward the envelops to be operated upon, a flap-moistening means and a receiver located immediately adjacent to said flap-moistening means to collect the envelops successively in a self-sealing stack for the purpose specified.

"11. In a device of the character specified the combination of a conveyer to support and feed the envelops to be operated upon, a holder for a plurality of envelops located at one side of said conveyer, a stripper to separate the envelops and cause them to be fed successively upon said conveyer, a flap-opening member and a flap-moistening member located over said conveyer, and a receiver located on the other side of said conveyer immediately adjacent to said flap-moistening member to collect the envelops successively in a self-sealing stack for the purpose specified."

These claims cover, broadly, combinations for sealing, in which the receiver or self-sealing stack is *"located immediately adjacent to said flap-moistening means."* This plainly defines a device embodying no pressure plate or roller, the receiving stack being the device relied upon for making and keeping the contact pending the moisture working its perfect work.

This amendment was not filed until after the defendant's patent had been granted, and the defendant's device had, to plaintiff's knowledge, been manufactured and put upon the market. But I am satisfied, and find, that the invention covered by claims 10 and 11 was made in 1917.

Turning now to the relations of the defendant with the plaintiff, its chief executive, Gray, was, from the organization of the plant until late in 1918 or early 1919, in the plaintiff's employ as chief mechanic. He was frequently consulted by Storck as to experiments, and was conversant with all the stages of experiments as to new devices. He was then, and had been almost from the beginning of his employment, engaged in trying to devise a machine of his own.

On April 5, 1919, he filed an application for a patent, No. 1,326,496, granted December 30, 1919, on a "machine for moistening

envelopes," which, as manufactured and used, is conceded by defendant's learned counsel to be a plain infringement on the plaintiff's patent, if valid.

It is clear, and I find, that Gray intended to appropriate, and did appropriate, the essence of Storck's idea as to the elimination of a pressure plate in his machine. The only possible defenses are that Storck's idea was not invention, or, if invention, had already been abandoned or dedicated to the public.

Gray's device, substituting a drum for a rubber belt operated by two rollers, is, for present purposes, the equivalent of the plaintiff's device. In his patent, he describes it as an apparatus for moistening flaps of envelopes preparatory to sealing the latter. But both the patent and his machine cover a receiver, and no sealing means are provided, except stacking and resultant pressure, in the receiver. Without the receiver, his machine would be commercially valueless.

Defendant's infringement is perfectly plain, if the plaintiff's claims 10 and 11 are valid.

I think and find that they are valid. On all the evidence I find that the conception of a sealer without pressure derived from mechanical devices was Storck's invention in 1917, that the elimination of the sealer was a great advance in the art, and until that time unknown. Prior use was not the equivalent; it went no farther than to recognize the receiving stack as supplementary to pressure, assumed to be necessarily derived from a mechanically operated device. That time and gravity in such a sealing stack would function completely and effectively was first availed of in Storck's new combination.

[1] The case falls very plainly under the rules laid down in authorities cited by plaintiff's own counsel, among others, Walker on Patents (5th Ed.) § 35, where, citing numerous authorities, it is said:

"It is invention to omit, from a prior process, a step which those skilled in its performance considered essential, but which the inventor proved to be useless." Pacific Contracting Co. v. Bingham (C. C.) 62 Fed. 281.

[2] The rule applicable to this case has been laid down over and over again. See Toch v. Zibell Paint Co., 233 Fed. 993, 148 C. C. A. 3, where it is said:

"For the doctrine is well settled in the law of patents that novelty is not negatived by a prior accidental production of the same thing, when the operator does not recognize the means by which the accidental result is accomplished, and no knowledge of them, or of the method of their employment, is derived from the prior use by any one."

Compare Wickelman v. Dick Co., 88 Fed. 264, 31 C. C. A. 530.

It seems to me very plain that the sealing which went on in the plaintiff's old machines, with the receiver, possibly in some instances without any advantageous results from the pressure plate, was accidental, incidental, not understood. I find this on all the evidence. But special reference may be well made to Storck's testimony. I find him to be a credible and reliable witness. Plainly, he was adept in the art. When he was devising a larger and speedier machine, he assumed—in spite of all his experience in using the old machines with the receivers, and his approval of the directions for allowing the envelope to remain in the stack until sealing was completed—that more, and not less, pressure would be necessary with his new high-speeded machine. It was not until he had unsuccessful experience with the larger machine with its heavier pressure that he grasped the real essence of the problem.

It seems to me impossible to find that there was prior public use of the device covered by the patent in suit when the inventor of both the old and the new devices was still of the firm opinion that pressure, originating mechanically in the machine, was necessary. It is to repeat to say that the old use was that of partial utilization of time and gravity in the sealing stack to complete the sealing process, whereas the new use is of utilization of time and gravity pressure in the sealing stack to perform the entire function. This is a new concept, and, in the plaintiff's machine, is covered by the device in which the sealing stack is put immediately adjacent to the moistening device, thus eliminating any place for a pressure plate.

[3, 4] Undoubtedly, as the defendant's counsel argues:

"It is not invention to omit one or more of the parts of a machine or manufacture, unless that omission causes a new mode of operation of the parts retained." Walker (5th Ed.) p. 44; Stow v. Chicago, 23 Fed. Cas. 195, 198.

But this case falls under the principle that:

"A reconstruction of a machine, so that a less number of parts will perform all the functions of the greater, may be invention of a high order."

This, in my view, is exactly what Storck did. He discovered that heavy pressure

from a mechanically applied device was no necessary or helpful factor in sealing envelopes. He omitted the presser plate device, so that the new machine, with the self-sealing stack adjacent to the moistening device, performed with a less number of parts all the functions of the old model machines. He put the whole sealing job upon the stack; whereas before it had been *begun* in the machine and *completed* in the stack.

Compare McClain v. Ortmayer, 141 U. S. 419, 12 Sup. Ct. 76, 35 L. Ed. 800; Union Special Machine Co. v. Quaker Flour Mills Co. (D. C.) 236 Fed. 246, 250; Topliff v. Topliff, 145 U. S. 156, 12 Sup. Ct. 825, 36 L. Ed. 658; Atwood-Morrison Co. v. Sipp Electric & Machine Co. (C. C.) 136 Fed. 859; Timolat et al. v. Phila. Pneumatic Tool Co. (C. C.) 131 Fed. 257.

The rule has been well stated as follows: "The chance operation of a principle, unrecognized by any one at the time, and from which no information of its existence, and no knowledge of a method of its employment, is derived by any one, if proved to have occurred, will not be sufficient to defeat the claim of him who first discovers the principle, and, by putting it to practical and intelligent use, first makes it available to man." Wickelman v. A. B. Dick Co. (C. C. A. 2d Circuit) 88 Fed. 264, 266, 31 C. C. A. 530; Pittsburgh Reduction Co. v. Cowles Co. (C. C.) 55 Fed. 301; Chase v. Fillebrown (C. C.) 58 Fed. 377; Topliff v. Topliff, 145 U. S. 161, 12 Sup. Ct. 825, 36 L. Ed. 658; Tilghman v. Proctor, 102 U. S. 707, 711, 26 L. Ed. 279; Andrews v. Carman, 13 Blatchf. 308; Munising Paper Co. v. American Sulphite Pulp Co. (C. C. A. 6th Circuit) 228 Fed. 700, 703, 143 C. C. A. 222; Consolidated Contract Co. v. Hassam Paving Co., 227 Fed. 436, 441, 142 C. C. A. 132; Toch v. Zibell Co., 233 Fed. 993, 148 C. C. A. 3; Byerley v. Barber Co. (D. C.) 230 Fed. 995.

It is clear that the sealing plate on the older models did, in most cases, perform a useful function. With envelopes only ordinarily full, run through the machine at a moderate speed, the pressure from the sealing plate was adequate to put and keep the flap in place on the envelope so that, even without subsequent pressure in a stack, the envelope would be firmly sealed.

The old models were and are fairly effective and commercially valuable machines.

But, even when used in connection with the receivers furnished by the plaintiff, their use was a different use from that which obtains in the new models covered by the patent in suit. In these models, *all* the sealing is done in the receiving stack. In the old models, the sealing was partly done on the conveyer, under the pressure plate, and completed in the sealing stack.

On all the evidence, I find and rule that the two machines are distinct, and that therefore the public use of the old models with the receiving stack was not a public use of the invention covered by the plaintiff's patent.

[5] The plaintiff also claims infringement of claim 3 as follows:

"In a device of the character specified the combination of a feed hopper adapted to receive a stack of envelopes, a conveyer arranged to contact with the lowermost envelope, of said stack and forward said envelope, a stripper adapted to permit the passage of said lowermost envelope from said stack while retarding those above it, a flap-opening means, a flap-moistening means and an elongated presser spring arranged to guide the envelope beneath said flap-opening means."

The infringement complained of is as to the "elongated pressure spring arranged to guide the envelope beneath said flap-opening means." The plaintiff's device is equipped with a rubber conveyer, and its elongated spring is intended to hold the back of the envelope down so as to guide it beneath the flap opener.

The defendant's device is a drum, operating rapidly, with a spring almost vertical, with a slight turn at the end, and probably performing essentially the same general function. It is not "an elongated spring"; it is a very short spring. But all such sealing devices require some mechanical means for holding the envelope against the conveyer in such fashion that it will move evenly and directly through the machine. No broad range of equivalents is permissible for such a device. I do not think the defendant's spring is the mechanical equivalent of the plaintiff's elongated spring. Therefore, on all the evidence, I find that claim 3 is not infringed.

The result is that there must be a decree for the plaintiff, based upon the defendant's infringement of claims 10 and 11.