THE VILLAGE OF ROSSVILLE, Appellee, *vs.* J. R. SMITH . *et al.* Appellants.

*Opinion filed December 17, 1912.*

1. SPECIAL ASSESSMENTS—*section 56 of Improvement act does not prevent court from setting aside confirmation judgment during term.* Section 56 of the Local Improvement act, which provides that the judgments of the court shall be final and subject to review only by appeal or writ of error, does not deprive the county court of power to set aside, alter or vacate a confirmation judgment during the term it is rendered.

2. SAME—*statute authorizes proceedings to be heard at a law or probate term.* Section 51 of the Local Improvement act authorizes a proceeding to confirm a special assessment to be heard either at a law or probate term of the county court.

3. SAME—*when the default by objectors is properly set aside.* Where there is nothing in the petition or ordinance for a paving improvement to indicate that the improvement will infringe any patent, and the village authorities, upon inquiry being made of them, state that· the ordinance does not call for a patented pavement and that there will probably be many bidders in competition for the work, whereupon the property owners waive objections and are defaulted, it is not error to open up the default, when it appears that there is only one bidder, and permit the trial of the question whether the work will infringe a certain patent.

4. SAME—*ordinance cannot require use of patented article obtainable from only one source.* A municipal corporation cannot, in an ordinance for a local improvement to be paid for by special assessment, require the use of a patented article not purchasable in the market or material which can be obtained from only one person, firm or corporation, even though the owner of the patent

or the material agrees to furnish it at a fixed price to any contractor bidding; and although the ordinance does not show, on its face, that the article specified is patented or controlled by a single owner, that fact, if true, may be proved.

5. The court reviews the evidence in this case, and holds that the specifications call for the construction of a pavement which infringes a patent owned by a single concern, and that, as competition was thus prevented, the village had no power to pass the ordinance, regardless of proof of the reasonableness of the bid for the work.

Appeal from the County Court of Vermilion county; the Hon. Lawrence T. Allen, Judge, presiding.

Acton & Acton, for appellants.

Thomas A. Graham, Arthur R. Hall, George A. Ray, and Lindley, Penwell & Lindley, for appellee.

Mr. Chief Justice Dunn delivered the opinion of the court:

This is an appeal from a judgment of the county court of Vermilion county confirming, over the appellants' objections, a special assessment for a street pavement. The petition was filed April 1, 1912, and on April 22, all legal objections having been waived, a default was entered and judgment was rendered confirming the assessment. On May 11 the appellants made their motion to set aside the order of confirmation and give them leave to file objections to the confirmation on the ground that the specifications contained in the ordinance require the construction of a wearing surface which cannot be constructed without infringing a certain patent known as the "Warren Bros. Company patent," and that on account of the existence of such patent no one but the patentee or his assigns can construct such pavement and there can be no free, open competition in the construction of the work, and the property owners will be deprived of their statutory right to put in the pavement for ten per cent less than the bid. On May 27

the court sustained the motion, the objections were filed, a hearing was had, the objections were overruled and the assessment again confirmed.

The appellee has assigned cross-errors questioning the action of the court in setting aside the first judgment of confirmation. It is argued that section 56 of the Local Improvement act, which provides that "the judgments of the court shall be final as to all the issues involved, and the proceedings in said cause shall be subject to review by appeal or writ of error as hereinafter provided, and not otherwise," prevents the setting of a judgment aside at the same term of court. The final judgments of a court are under the control of the court until the end of the term at which they were rendered. During that term they may be vacated, changed or modified, as justice may require, and they do not become final in the sense that they may not be changed by the court until the expiration of the term. Section 56 does not change this rule.

It is insisted, however, that the judgment of confirmation of April 22 was at the April probate term of the county court; that that term expired on the first Monday of May, and that on May 11, when the motion was made, as well as on May 27, when the judgment was set aside, the court, because of the lapse of the April term, was without jurisdiction of the subject matter. The record shows that the proceedings were at a term begun and held for the transaction of common law and criminal business, which was begun on the first day of April and adjourned on May 29, 1912. Section 51 of the Local Improvement act authorizes the proceedings to be heard at either a law or probate term of the county court.

The appellee insists that no sufficient showing was made to set aside the default; that the facts which form the basis of the objection now urged could have been ascertained at the time the appellants waived all legal objections in open court and permitted a default to be taken and the

judgment of confirmation entered, and that the judgment so entered by consent could not be set aside on the motion of one of the parties. It appears from the affidavits filed on the hearing of the motion that the appellants employed counsel for the purpose of objecting to the assessment if any valid ground existed for objecting, and the counsel examined the petition and ordinance but found no ground for objections on the face of the proceedings. The ordinance contained a notice that all fees for any patented invention, article or arrangement should be included in the price bid and that the contractor must protect the village against all such fees. In response to counsel's inquiry he was informed by the appellee's attorney that the ordinance did not call for any patented pavement and that there would probably be ten or twelve bidders in competition for the work. No person not possessed of expert knowledge on the subject could tell that a pavement constructed according to the specifications in the ordinance would infringe any patent. The appellants thereupon waived all legal objections and permitted the default to be taken and the roll confirmed. After the advertisement for bids only one bid was received, and the appellants then first learned that it was thought the work would infringe the Warren Bros. Company patent, and upon investigation became convinced that it would do so. The appellants permitted the default under the mistaken belief that the work would not infringe any patent. The appellee either had the same mistaken belief or believed that it would infringe a patent. In the one case the mistake was mutual; in the other the appellants were fraudulently imposed upon. In either case the default was properly set aside to permit a trial of the question whether the work would infringe the patent or not.

Under our statute a municipal corporation cannot, in an ordinance for a local improvement to be paid for by special assessment, require the use of a patented article not purchasable in the market, or of material which can be ob-

256 — 20

tained of only one person, firm or corporation, even though the owner of the patent or of the material should agree to furnish the article or material at a fixed price to any contractor bidding. (*Siegel* v. *City of Chicago,* 223 Ill. 428.) If such an ordinance does not show, on its face, that the article specified is patented or controlled by a single owner that fact may be proved. *Fishburn* v. *City of Chicago,* 171 Ill. 338.

An exemplification of the letters patent from the United States was introduced in evidence, and the validity of the patent is not questioned. The reasonableness of the ordinance is not questioned unless the specifications require a construction which will infringe the patent. The only question, therefore, is whether the pavement specified by the ordinance would be an infringement of the patent,—and this must be determined by a consideration of the evidence.

The specification for the wearing surface was as follows: "On the foundation described shall be laid an asphaltic concrete wearing surface, consisting of hard, sound, crushed stone of varying sizes, from the largest that will pass a circular opening having a diameter of one and one-quarter inches to that which will remain on a screen having four meshes to the linear inch, and clean, moderately sharp, well-graded sand or screenings, and Sarco mineral rubber asphalt cement, No. 99, or any asphalt equal thereto. The mixture shall contain approximately fifty-five to sixty parts of crushed stone and forty to forty-five parts of sand or screenings, and there shall be between three and five per cent of the entire mineral aggregate that will pass a screen having 200 meshes to the linear inch. If the stone and sand are deficient in the 200-mesh material it shall be supplied by the use of Portland cement or pulverized limestone. Should the broken stone delivered on the work contain particles that will pass a screen having four meshes to the linear inch, they shall be considered as sand in determining the proportions of the various ingredi-

ents.   The mineral aggregate above specified shall be heated to approximately 300 degrees F. in driers of the revolving type, and, before cooling, measured off in a properly designed mixer with revolving blades.   Asphalt cement which has been melted and raised to a temperature of about 325 degrees F. shall be added in sufficient quantity,—about seven to nine per cent,—to thoroughly coat all particles of the mineral aggregate.   The mixing shall be continued until a thorough and intimate mixture of the ingredients has been accomplished, and shall not be exposed to the direct action of the fire.   The various materials shall be so proportioned that the paving mixture, when thoroughly compacted, will produce a solid mass of maximum density. The exact proportions of the different ingredients shall be determined by laboratory tests, and shall not be varied except by written consent by the board of local improvements.   All gauges and measuring devices shall be of definite and constant capacity, capable of delivering uniform proportions of the several materials.   The board of local improvements shall be furnished samples of paving mixture at any time upon its request.   The paving mixture, if delivered on the street in dump wagons, shall be kept covered with canvas to retain the heat.   Each wagon load of mixture shall be dumped so that it is necessary to reshovel the entire load, and the mixture shall be completely turned and shoveled into place and spread with hot iron rakes, so that after compression it shall have a thickness of one and one-half inches, with the surface even and true to grade.   The temperature of the mixture when dumped on the street shall be between 250 degrees F. and 350 degrees F.   After it has been spread to the proper thickness it shall be rolled with a self-propelled roller weighing at least five tons, and the rolling shall be continued, both lengthwise and diagonally of the street, until all roller marks have disappeared and further compression is impossible."

The following notice to bidders was made a part of the specifications attached to the ordinance: "All fees for any patented invention, article or arrangement that is used upon or in any manner connected with the construction, erection or maintenance of the work, or any part thereof, embraced in the contract and specification, shall be included in the price stipulated in the contract for said work, and the contractor must protect and hold harmless the village against any and all demands of such fees and claims."

The specifications of the patent, so far as necessary to be set out here, are substantially as follows: The invention relates to the wearing surface of street pavements, consisting of a foundation of mineral matter and a wearing surface of graded mineral matter united by means of asphalt or coal tar. The invention is based on the inventor's discovery that to insure the best conditions of construction, wear and life in the top surface the wearing surface must be as dense and free from voids as possible, stable and not liable to displacement, and that what had theretofore been supposed to be the best provision for eliminating voids and establishing stability,—the use of sand or fine gravel united by a plaster asphalt vehicle,—had, in fact, been almost the poorest provision for accomplishing these purposes. Under the art as theretofore practiced, the mineral matter uniting the plastic material had generally been fine gravel or sand, or broken stone not exceeding pieces one-tenth of an inch in diameter; that the smallest percentage of voids under that method was about twenty-one per cent. To secure stability there must be a departure from that method, and by using larger pieces up to those which will pass through a two-inch ring, together with a proper quantity of smaller pieces down to an impalpable powder, it is possible to reduce the voids of the mineral base below ten per cent of its bulk. A pavement thus formed will be a solid, dense and compact body possessing the highest degree of stability, and it will offer the

smallest area of surface for the attachment of the plastic composition to it, so that not only is a superior binding effect or union .obtained, but a smaller quantity of it is necessary for the purpose of obtaining the superior result or product. The stones of the different sizes are not to be used in layers of corresponding sizes but are mingled with each other from the upper to the lower surface of the pavement, and the asphalt or other plastic composition permeates the whole mass, uniting the particles, filling the voids and making a solid surface. The invention is not as to the asphalt used or as to the process of using it, but relates solely to the finished product, as set forth in the various claims of the inventor. It is substantially a street pavement wearing section composed of a mineral structure of inherent stability, formed of several grades of material so proportioned as to have less than twenty-one per cent of voids, in combination with a bituminous binder sufficient in quantity to fill the voids.

The specifications of the ordinance require a wearing surface consisting of hard, sound, crushed stone of varying sizes, from the largest that will pass a circular opening having a diameter of one and one-quarter inches to that which will remain on a screen having four meshes to the linear inch, and a clean, moderately sharp, well-graded sand or screenings and asphalt, the mixture containing approximately fifty-five to sixty parts of crushed stone, forty to forty-five parts of sand or screenings, and between three and five per cent of the entire mineral aggregate such as will pass a screen having 200 meshes to the linear inch, the various materials being so proportioned that the paving mixture, when thoroughly compacted, will produce a solid mass of maximum density, the exact proportions of the different ingredients to be determined by laboratory test. The question, then, is whether these materials, treated as required by the specifications, will produce the patented pavement. The mineral ingredients and the asphalt binder

are found in both the specifications and the patented pavement. If the construction of the pavement in accordance with the specifications will produce a pavement having an inherent stability and less than twenty-one per cent of voids it must be practically the patented pavement.

Appellants introduced one witness, Isaac VanTrunk, a chemical engineer of thirteen years' experience in the laboratory and operating departments of the paving industry. He testified that he was familiar with the Warren patent and the type of construction it called for, and also with the specifications in this case. For the purpose of ascertaining whether the ordinance infringed the patent he had made a laboratory test. He made a cubic-foot box lined with asphalt paint, and calked the joints and filled the box with the mineral aggregate as specified in the ordinance. This mixture was thoroughly tamped and water poured in, which had been weighed, until all the voids were filled flush with the top of the box. It was ascertained that these voids were less than twenty-one per cent. The mixture had an inherent stability and was very stable. The witness also made an estimate to determine the amount of asphaltic cement it would take to fill the voids in the mixture, and found that it would be between seven and nine per cent, depending upon the asphalt employed. When a mixture of that kind is made and put together as it should be in a pavement, so that the asphalt and cement would be churned and thoroughly mixed up, the mineral aggregate and asphalt cement would practically fill those voids and would bind them together. It would fill the voids and bind the material together at the same time. It could not perform one function without performing the other. With the mixture that he made in the box the mixture would be of maximum density. He testified that the proportion of the different grades of stone, sand, dust and asphalt specified in the ordinance is substantially the same as in

the patent, and that the pavement produced would be an infringement of the patent.

This testimony clearly shows an infringement, and it was not met by the testimony of appellee. No attempt was made to show any other laboratory test, or to show that the voids in a pavement constructed according to the specifications would not be less than twenty-one per cent or that the pavement would not have inherent stability. Three witnesses were examined on behalf of the appellee, and were of the opinion that the pavement could be constructed in accordance with the specifications without infringing the patent. The distinctions on which the opinions were based were, that under the specifications it is claimed crusher-run stone can be used while the patent requires graded stone, and that under the patent the voids were filled with asphalt while under the specifications the particles of stone are only stuck together with asphalt. The stone required to be used is crushed rock, varying from the largest that will pass through a one and one-quarter inch circular opening to the smallest that will remain on a screen having four meshes to the linear inch. The crusher-run stone will vary in size, and it must vary within the limits of the specifications. There is no merit in this supposed distinction. As to the other distinction, the specifications provide for the assembling of the stone, sand, screenings and dust composing the mineral aggregate and heating it to 300 degrees Fahrenheit in driers of the revolving type. Asphalt cement melted and heated to about 325 degrees must be added in sufficient quantity,—about seven to nine per cent,— to thoroughly coat all particles of the mineral aggregate, and the mixing is to be continued until a thorough and intimate mixture of the ingredients has been accomplished. The mixture is then to be delivered on the street hot, completely turned and shoveled into place, spread with hot iron rakes, and then rolled with a five-ton roller, lengthwise and diagonally, until further compression is impossible. The

seven to nine per cent of asphalt is the proportion shown to be required to fill the voids, and it is evident that the effect of the mixing and rolling required is to fill the voids.

It is claimed that the pavement could be constructed without infringing the patent by the use of stone no larger than one-half inch. This would not, however, comply with the specifications, which call for stone of varying size, from one and one-quarter inches to one-quarter inch. Moreover, the testimony is that a maximum density would not thus be secured, as the specifications require. To secure a solid mass of maximum density requires the use of the larger size of stones.

Evidence was given that the amount bid for the contract was reasonable, but such evidence was immaterial. The ordinance, because it prevented competition, was not within the power of the council to pass.

The judgment is reversed and the cause remanded to the county court, with directions to sustain the appellants' objections. *Reversed and remanded, with directions.*