**Henry Schoellkopf et al., Trustees, Appellants, v. City of Chicago et al., Appellees.**

## Gen. No. 24,921.

1. MUNICIPAL CORPORATIONS, § 381*—*validity of street paving contract based on specifications prescribing patented product.* If the specifications for street paving prescribe a creosote oil which cannot be made without infringing a concededly valid patent, a contract based thereon is void, under section 74 of the Local Improvements Act (J. & A. ¶ 1466).

2. MUNICIPAL CORPORATIONS, § 381*—*determination of question of restriction of free competition among bidders for local improvement by specifying patented article.* In determining whether there has been a restriction of free competition among bidders in violation of section 74 of the Local Improvements Act (J. & A. ¶ 1466), there is no difference in principle between a case where the ordinance specifies a patented article and a case where the specifications under the ordinance specify such an article.

3. INJUNCTION, § 71*—*jurisdiction to restrain performance of illegal contract.* A court of equity has jurisdiction to restrain the performance of a contract which tends to restrict competitive bidding or which is otherwise illegal or void.

4. PATENTS, § 38*—*evidence as to whether street-paving specifications prescribe oil infringing patented oil.* In determining whether the specifications for street paving prescribe an oil which will infringe a patented oil, the unsupported opinion of the patentee that there is no infringement will not prevail over the contrary opinion of expert witnesses based upon facts disclosed by laboratory tests made by them.

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

5. PATENTS, § 38*—*what does not avoid infringement.* Infringement of a patent cannot be avoided merely because tests are necessary to determine infringement.

6. PATENTS, § 38*—*how question of infringement may be determined.* In determining whether or not a patent is infringed, any method of test may be employed which will fairly determine the question.

7. PATENTS, § 38*—*when patent for oil infringed.* On a bill to restrain the performance of a contract for street paving on the ground that the specifications prescribe an oil which will infringe a valid patent, in determining whether or not such infringement will result, the tests made by complainants' experts are not required to be confined to the tests set forth in such specifications, but must be carried far enough to show the chemical or physical constituents, and, if the tests disclose that such constituents are the products mentioned in the patent, the patent is infringed.

8. PATENTS, § 38*—*what infringement of patent depends upon.* Infringement of a patent depends upon a violation of the claims of the patent as distinguished from the specifications.

9. MUNICIPAL CORPORATIONS, § 381*—*estoppel of patentee of oil prescribed by street paving specifications.* On a bill to restrain the performance of a contract for street paving on the ground that the specifications prescribe an oil which will infringe a valid patent and that therefore the contract is invalid under section 74 of the Local Improvements Act (J. & A. ¶ 1466), the statement of the patentee, while on the stand, that no prosecution for infringement will be commenced against any one seeing fit, under a contract with the city, to furnish the oil called for by the specifications, while estopping the patentee, does not invalidate the patent.

10. MUNICIPAL CORPORATIONS, § 381*—*when street-paving specifications prescribe oil which infringes patent.* Specifications for a contract for street paving *held*, under the evidence, to prescribe an oil which infringes a valid patent and to tend to foster a monopoly and, therefore, to render the contract void.

Appeal from the Circuit Court of Cook county; the Hon. OSCAR E. HEARD, Judge, presiding. Heard in the Branch Appellate Court at the June term, 1918. Reversed and remanded with directions. Opinion filed December 2, 1919. Rehearing denied December 20, 1919.

Statement of the Case. This is an appeal from a decree of the Circuit Court of Cook county entered

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

February 27, 1918, dismissing for want of equity complainants' bill to restrain the performance of a contract for paving Sherman street from the south line of West Jackson street to the north line of West Van Buren street in the City of Chicago. The preliminary proceedings for the proposed improvement were had under the Local Improvements Act of 1897, and amendments thereto. The appeal was first perfected in the Supreme Court, but that court ordered the cause transferred to this court, for the reasons (as stated in the opinion) that the validity of the ordinance was not questioned and the assignments of error presented no questions giving jurisdiction to the Supreme Court to review the record. (*Schoellkopf v. City of Chicago,* 285 Ill. 458.)

The bill alleges in substance that complainants are residents of Chicago, taxpayers, and owners of certain property, specially assessed for a creosoted wooden block pavement; that on February 5, 1917, the ordinance for the pavement was passed by the City Council; that on March 12, 1917, the petition praying for the levying of a special assessment to pay for the improvement at the estimated cost of $7,500, was filed in the County Court of Cook county; that on May 21, 1917, judgment of confirmation was entered; that on June 8, 1917, the advertisement for bids was made; that on June 20, 1917, the bids received for said work were opened and publicly declared; that said Ryan Company, a corporation, and John A. McGarry & Co., a corporation, were the only bidders; that each of said bidders stated that it proposed to use the paving blocks manufactured and treated by the Republic Creosoting Company of Indianapolis, Indiana; that the Ryan Company's bid was the lower, and that on July 2, 1917, it was awarded the contract and said award subsequently published, and that on July 16, 1917, the contract with the specifications attached, together with the bond of

the contractor, were signed and executed; and that said Ryan Company intends and threatens to at once begin the construction of said improvement unless restrained.

The bill further alleges that the provisions of said *ordinance* with reference to the character of the wood preserving oil to be used in the manufacture of the paving blocks are as follows:

"The wood preserving oil shall be a distillate obtained wholly from coal tar, and shall have a specific gravity at twenty-five (25) degrees Centigrade of not less than one and ten one-hundredths (1.10) nor more than one and thirteen one-hundredths (1.13). It shall contain not more than one (1) per cent of matter insoluble in hot benzol and chloroform.

"When one hundred (100) grams of the oil are placed in a stoppered glass retort having a capacity of eight (8) ounces up to the bend of the neck of the retort, with a thermometer placed in the retort so that the bulb thereof shall be one-half (½) inch above the oil in the retort at the commencement of the distillation and then subjected to a distilling test until heated to a temperature of three hundred and fifteen (315) degrees Centigrade, not more than forty (40) per cent by weight of said oil shall distill off.

"The distillation of the oil shall be carried to three hundred and fifty-five (355) degrees Centigrade, and the residue thus obtained, when cooled to fifteen (15) degrees Centigrade, shall not be brittle, but shall be of a soft wax-like nature. When a small portion of this residue is placed on white filter paper and warmed, the oil spot produced, viewed by transmitted sunlight, shall be of an amber color."

The bill further alleges that the provisions of said *specifications* with reference to the wood preserving oil are as follows:

"*Oil.* 1. The oil shall be a distillate obtained wholly from coal tar.

"2. It is required by this specification that the oil used shall be wholly a distillate oil obtained only by distillation from coal tar. No other material, of any kind, shall be mixed with it.

"3. The oil shall contain not more than one (1) per cent of matter insoluble in hot benzol and chloroform.

"4. Its specific gravity at twenty-five. (25) degrees Centigrade shall be not less than one and eight-hundredths (1.08) and not more than one and twelve-hundredths (1.12).

"5. The oil shall be subject to a distilling test as follows:

"The apparatus for distilling the creosote must consist of a stoppered glass retort having a capacity, as nearly as can be obtained, of eight (8) ounces up to the bend of the neck, when the bottom of the retort and the mouth of the off-take are in the same plane. The bulb of the thermometer shall be placed one-half (½) inch above the liquid in the retort at the beginning of the distillation, and this position must be maintained throughout the operation. The condensing tube shall be attached to the retort by a tight cork joint. The distance between the thermometer and the end of the condensing tube shall be twenty-two (22) inches, and during the process of the distillation the tube may be heated to prevent the congealing of the distillates. The bulb of the retort and at least two (2) inches of the neck must be covered with a shield of heavy asbestos paper during the entire process of distillation, so as to prevent heat radiation, and between the bottom of the retort and the flame of the lamp or burner two (2) sheets of wire gauze each twenty (20) mesh fine and at least six (6) inches square must be placed. The flame must be protected against air currents.

"The distillation shall be continuous and uniform, the heat being applied gradually. It shall be at a rate approximating one (1) drop per second, and shall take from thirty (30) to forty (40) minutes after the first drop of distillate passes into the receiving vessel.

The distillates shall be collected in weighed bottles and all percentages determined by weight in comparison with dry oil. When one hundred (100) grams of the oil are placed in the retort and subjected to the above test, the amount of distillate shall not exceed the following:

"Up to 150 degrees Centigrade, 2 per cent.

"Up to 210 degrees Centigrade, 10 per cent.

"Up to 235 degrees Centigrade, 20 per cent.

"Up to 315 degrees Centigrade, 40 per cent.

"The distillation of the oil shall be carried to three hundred and fifty-five (355) degrees Centigrade. The residue thus obtained when cooled to fifteen (15) degrees Centigrade shall not be brittle, but shall be of a soft waxy-like nature so that it can be readily indented with the finger. When a small portion of this residue is placed on white filter paper and warmed, the oil spot produced, when viewed by transmitted light, shall appear of an amber color.

"6.   The tar acids of the distillate from two hundred and fifty (250) degrees Centigrade to three hundred and fifteen (315) degrees Centigrade must not be less than five (5) per cent of this distillate (250° to 315° C.).

"7.   The amount of the unsaponifiable oil (by sulphuric acid and caustic soda) in the distillate from two hundred and fifty (250) degrees Centigrade to three hundred and fifteen (315) degrees Centigrade must not exceed three and one-half (3½) per cent of this distillate.

"The contractor shall deliver to the Board of Local Improvements an affidavit from the individual manufacturing the blocks (if manufactured by an individual), from the managing officer of the corporation manufacturing the blocks (if manufactured by a corporation) and by an active member of the firm manufacturing the blocks (if manufactured by a firm), setting forth that all oil used for treating the blocks for this contract is a distillate oil obtained wholly and

entirely by distillation from coal tar and that it is free from any adulteration.''

The bill further alleges *inter alia* that the wood preserving oil described in said specifications is manufactured exclusively by said Republic Creosoting Company, an Indiana corporation located at Indianapolis (hereinafter called Republic Co.); that said oil specifications are arbitrary and drawn in the interest of the Republic Co.; that by clause 6 of the specifications it is provided that the tar acids of the distillate from 250 degrees Centigrade to 315 degrees Centigrade *"must not be less than five (5) per cent of this distillate* (250° to 315° C.)''; that said clause 6, known as the ''tar acid clause,'' was written by and in the interest of said Republic Co., and was inserted in said specifications for the sole purpose of excluding all distillers of coal tar and all manufacturers of creosoted wooden paving blocks other than said Republic Co., and has greatly increased the cost of said oil and the proposed pavement to the damage of the owners of property assessed; that clause 7 of the specifications was inserted therein for the same purpose and with a like result; that the description of said oil in the ordinance is apparently an open specification, upon which free and fair competition in bidding can be had, whereas the description of said oil in the specification is a closed specification, and that it tends to exclude from bidding all distillers of coal tar and all manufacturers of said paving blocks other than said Republic Co.; that the oil described in the specifications is a patented article owned or controlled by said Republic Co., and that the specification of a patented article to be used in the making of a public improvement to be paid for by special assessment is contrary to the meaning and spirit of section 74 of the Local Improvements Act of 1897 (J. & A. ¶ 1466) and amendments thereto, and is contrary to public policy, illegal and void; that

Peter C. Reilly, of Indianapolis, president of said Republic Co., did on March 20, 1917, procure letters patent of the United States, No. 1,220,001, specifying a material for the preservation of lumber; that the oil described in the specifications cannot be made commercially without infringing upon said patent, and that the inclusion of said patented article in said specifications has greatly increased the cost of the proposed pavement; that said Republic Co. is the only distiller of coal tar and the only manufacturer of creosoted wooden paving blocks that can supply the oil required by said specifications, and that it controls the supply of the same; that said Ryan Company, to which the contract for said improvement has been awarded, can obtain the oil necessary therefor only from said Republic Co., or from some other company that derives its oil from said Republic Co.; that said oil specifications tend to foster a monopoly and are contrary to public policy and void; that the same have the effect of nullifying the provisions of section 74 of said Act (J. & A. ¶ 1466), and tend to make the bids less favorable to the public and to the owners of the property assessed, and that they are a substantial departure from the ordinance. The bill prays that the City of Chicago and the Board of Local Improvements may be enjoined from performing said contract made with the Ryan Company and from delivering vouchers or bonds or other evidences of indebtedness to it, and that said city, its comptroller and treasurer may be enjoined from paying any vouchers, etc.

The ordinance, the advertisement for bids, the bid of the Ryan Company, the contract and specifications and the Reilly patent were attached as exhibits to complainants' bill and made a part thereof. All were introduced in evidence by complainants. The specifications of the Reilly patent, including the four claims thereof, are in part as follows:

"My present invention pertains to an improved material for the treatment of lumber, for the preservation thereof.

"In the manufacture of such material I have, through a new process of distillation of coal tar or coal tar pitch, produced two new substances and intermixed said substances with a suitable solvent, preferably the lighter oils driven off during the first distillation of coal tar, and used this compound as a preservative material for treating lumber.

"Ordinarily, in the distillation of coal tar, such distillation is discontinued when the anthracene oil stops coming over. * * * I have by the employment of a still which is subjected to an even temperature over its entire exterior surface, been able to commercially distill coal tar and coal tar pitch so that they will ultimately produce three products heretofore not commercially known, namely, a material orange in color which passes from the still when the same is subjected to a temperature approximately from 700° to 800° F., this after the anthracene has passed over, which material is waxy at 70° F., and has a specific gravity of from 1.147 up to 1.22; secondly, a hard, garnet-colored product, brittle at 70° F., having a specific gravity of not less than 1.22 and which, when cut with a knife, flakes, the cut surface of the material likewise being of a brilliant garnet color; and thirdly, a dry coke, sponge-like in appearance and which is readily handled. These first two products I intermix and dissolve in a suitable solvent such, for instance, as the oils distilled from coal tar during the first distillation thereof. The mixture thus produced is extremely valuable for use in the preservation of wood, and lumber, such as street-paving materials, railroad ties and the like. Heretofore the relatively light oils produced in the distillation of coal tar have been employed as preservatives for lumber, but inasmuch as they have a very low boiling point and are of a specific gravity not much higher than that of water, they rapidly escape from the timber by volatilization

and are to a slight extent washed away by water. When, however, such oils are mixed with the heavy products above mentioned this does not occur. After being once passed into the material, the mixture remains therein, regardless of temperature or moisture conditions, the compound being very efficient as a preservative and likewise being stable. The dry coke above mentioned does not, of course, enter into the preservative composition, but is employed in various commercial ways. No claim is made herein to the process of producing the materials above set forth, * * * nor is any claim made to the still, * * *.

"Having thus described my invention, what I claim is:

"1. A composition of matter, for use in the preservation of timber, comprising a mixture of waxy material produced as a distillate from coal tar, and having a specific gravity of not less than 1.14; a hard material formed as a distillate from coal tar and having a specific gravity of not less than 1.22; and a suitable solvent for said materials.

"2. A composition of matter, for use in the preservation of timber, comprising a mixture of a waxy material produced as a distillate from coal tar, and having a specific gravity of not less than 1.14; and a hard material formed as a distillate from coal tar and having a specific gravity of not less than 1.22, said materials being dissolved in the lighter oils distilled from coal tar.

"3. A composition of matter, for use in the preservation of timber, comprising a mixture of those materials which are produced as a distillate from coal tar when the latter is subjected to a temperature of at least 700° F., said material having a specific gravity in excess of 1.14, said distillates being dissolved in a suitable solvent.

"4. A composition of matter for the treatment of timber, comprising a mixture of all of the distillates of coal tar which are driven off therefrom up to a temperature approximating 1000° F."

The answer of the City of Chicago and Board of Local Improvements admits the ownership by complainants of the property mentioned in the bill and that the same has been specially assessed for the proposed pavement at the sum mentioned, and that such steps were taken as resulted in the letting of the contract to said Ryan Company. The answer alleges that said specifications were for the most part prepared in the year 1912 by city officers, predecessors of the defendants, after much investigation and because of much difficulty experienced under former specifications from the "exudation of tar from wood paving blocks," that the same were the result of a search by said officers for a paving preservative oil that would avoid the great nuisance of said exudation, that since said date no changes in the specifications generally used by the city affecting the character of the oils have been made, save some "minor additions designed for the detection of adulteration," and that said Republic Co. had nothing to do with the preparation of said specifications in 1912, or any changes therein, "except that an officer of said Republic Co., Peter C. Reilly, was asked at various times, in connection with the study by the city officers of the problem of paving, for information as to the character of various preservatives and means of detecting adulterants thereof." The answer further alleges that "said clause 6 was inserted in the specifications for the sole purpose of assuring that the oil furnished under said specifications would not be adulterated with oil tar instead of oil from coal tar,— the said adulterant oil tar being an article which contains no tar acid other than negligible quantities, whereas oils from coal tar do contain portions of tar acid"; that "clause 6 is intended for no purpose other than to guard against dishonest contractors or manufacturers adulterating distillate oil of coal tar, oil tar distillate being a tar from petroleum, and to secure

the obtaining of coal tar distillate from a good grade of coal tar''; that ''clause 7 was inserted in said specifications as a test of whether or not the furnisher of said oil furnished a distillate of coal tar adulterated with a distillate of petroleum tar or adulterated with crude petroleum tar''; and that ''clause 7 has no relation whatever with the cost and production of any distillate of coal tar, but merely to guard against the adulteration of distillate of coal tar with a foreign matter.'' The answer admits that on March 20, 1917, said Peter C. Reilly, president of said Republic Co., procured United States Letters Patent, No. 1,220,001, mentioned in the bill, but denies that the same is a valid patent, and alleges that it plainly appears from the face thereof that ''the articles covered by the same are certain combinations of creosote oils or other oils, all of which appear to be oils of heavier specific gravity than any oils admitted in and by said Chicago specifications.'' All of the other material allegations of the bill are in substance denied.

The answer of the Ryan Company denies that any combination exists among contractors to limit the number of bidders and to increase the contract price of creosoted wooden pavements in Chicago, denies that its bid was made in pursuance of any such combination, and alleges that all other paving contractors in Chicago and elsewhere had the privilege of bidding on the work, and that the contract was awarded to it as the lowest responsible bidder, in good faith and after full compliance by the city with the statutes and ordinances.

On the trial the suggestion was made by counsel for the city in his opening statement, following the allegation contained in the answer of the city, that the judgment of confirmation in the special assessment proceeding was *res adjudicata* of the matters sought to be determined by the bill. The point, however, was not

pressed in the trial court, and is not here made, possibly for the reason that the matters complained of occurred after the judgment of confirmation was entered. Complainants did not claim that the *ordinance* tended to restrict competitive bidding, or that anywhere in the special assessment proceedings there was any such suggestion. This appears, as they claim, from the *specifications*, and the first intimation they had thereof was when the city advertised for bids, in which advertisement it was stated that proposals would be received for the construction of the improvement "according to the plans and specifications on file in the office of the Board of Local Improvements." The advertisement was made June 8, 1917, the contract awarded July 2, 1917, and complainants' bill filed August 3, 1917. Both parties stated to the trial court, repeated in the oral argument here, that they were desirous of having the case decided on its merits, inasmuch as the points involved were of importance to property owners, the City of Chicago and contractors engaged in the particular line of work. It appears that the Chicago creosoted wooden paving block specifications of 1912, mentioned in the answer of the city, were amended in 1914, and it was stipulated that the records of the Board of Local Improvements showed that clauses No. 6 (tar acid clause) and No. 7 (unsaponifiable clause) were incorporated into the specifications on February 20, 1914. Peter C. Reilly testified that he suggested to the city the inclusion of both clauses in said specifications.

Much evidence, oral and documentary, was introduced by the complainants in support of their contention that the contract and specifications are void, in that they, in violation of section 74 of the Local Improvements Act (J. & A. ¶ 1466) and contrary to the public policy of the State, *tend* to restrict competition among bidders. The evidence offered may be grouped for

convenience under two general heads, viz.: (1) The tendency, as complainants claim, to restrict the manufacture of creosote oil to the holder of the Reilly patent by specifying an oil which can be manufactured only by infringing said patent. (2) The tendency to foster a monopoly in the manufacture of creosote oil and creosoted wooden paving blocks. All the proof offered, however, bears upon the one issue of the tendency to restrict competitive bidding. Complainants claim that the alleged departure of the specifications from the ordinance is only significant as it bears upon the question of restriction of the quality and quantity of creosote oil available under the specifications as compared with that available under the ordinance. The city sought to justify the departure from the ordinance on the ground that the specifications, while admittedly different from the ordinance, were intended merely to secure a creosote oil which was free from adulteration, and that clauses 6 and 7 of the specifications would protect the property owners in that regard. Complainants, however, endeavored to show that said departure tended to a different result, viz., that of preventing the use of any creosote oil not made or controlled by said Republic Co. (of which Peter C. Reilly is president) and preventing the treatment of paving blocks with any oil other than that covered by the Peter C. Reilly patent.

On the question whether the specifications in fact specified a creosote oil, as described and claimed in said Reilly patent (the validity of which was not questioned by the defendants at the trial), complainants introduced the testimony of three witnesses. Henry E. Mason testified in substance that he served a notice upon the defendants December 11, 1917, to produce a sample of the creosote oil submitted to the city by the Ryan Company, the contractor, or, in case no such sample had been submitted by said Ryan Company, to

produce samples of Chicago oil previously submitted by contractors under the same specifications for other creosoted wooden block pavements, and to permit complainants and their experts to examine and test such samples for the purpose of determining whether the oil specified infringed said Reilly patent; that after these notices had been served it developed that said Ryan Company had not submitted any sample of creosote oil; and that subsequently the counsel for the city stated that he was willing to produce samples of said Chicago oil for examination by complainants, provided that the city chemist, Mr. Eaton, should be present at such examination or tests, in order that there might be no dispute as regards the identity of the oil and the samples examined.

Lester Kirschbraun, one of complainants' expert witnesses, testified in substance that he is a chemical engineer, specializing in pavements and paving materials; that he does business in his laboratory in Chicago under the name of Chicago Paving Laboratory; that he has tested coal tar and coal tar products for over 10 years; that from 1907 to 1910 he was chemist for the City of Chicago in the asphalt testing laboratory, having to do with the testing of asphalts and creosote oils in connection with the Board of Local Improvements; that some time in December, 1917, certain samples of said Chicago oil were brought into his laboratory by Mr. Eaton, the city chemist; that he twice tested the same in the presence of Mr. Eaton; that the tests showed that said samples met the Chicago oil specifications; that his method of testing corresponded with the requirements of said specifications; that the two tests were made, respectively, on December 26, 1917, and January 9, 1918—the latter test being made in the presence of a third chemist, Mr. Carl Miner; that he has read and understands the Reilly patent, No. 1,220,001; that he also tested said

samples for the purpose of determining whether or not it is the same oil as described and claimed in said patent; that the oil contained a fraction of waxy material having a specific gravity in excess of 1.14, and a hard material formed as a distillate from coal tar and having a specific gravity of not less than 1.22; that the oil contained these materials dissolved in lighter oil contained in the coal tar—the lighter oils being removed at the lower temperature; that the oil contained no other elements, except the various fractions which were isolated, ranging in specific gravity all the way from 1.14 to 1.22; that claim 2 of said Reilly patent appears to be a correct description of the oil which he tested; that claim 1 of said patent is a correct description of the oil which he tested, and that the oil which he tested corresponded with the description in claim 3 of said patent. The witness produced his original notes made by him at the time of the making of said tests and the same were offered in evidence. The witness further testified on direct examination: "The samples furnished by Mr. Eaton were first subjected to distillation for the tests called for by the specifications of the city and they were found to be in compliance with them. The *residue* of this distillation was placed in an iron retort and subjected to further distillation at a higher heat. This retort was protected in such a way that the flame came in contact with the sides of the retort and it was heated all over. Various fractions were isolated in the process, in the course of this distillation, and the specific gravity of these fractions was determined. It was found that these fractions varied in specific gravity from a point in excess of 1.14 to a final specific gravity, in the last fraction that would boil over, of 1.22." On cross-examination the witness testified in substance that he made all the tests that were called for by the city's specifications, including the chemical and physical tests; that in mak-

ing the two separate tests, the one at which Mr. Miner was not present and the one at which he was present, he followed substantially the same *modus operandi;* that the highest point of heat developed in the test to determine whether or not the sample of oil conformed to the city's specifications was 355 degrees Centigrade (671 degrees Fahrenheit) ; that after this temperature had been reached he then transferred the residue in the glass retort to an iron retort; that whatever had distilled over below 355 degrees Centigrade had of course been removed from the glass retort; that said residue conformed to the city's specifications; that to the iron retort in which said residue was placed he then applied heat up to 752 degrees Fahrenheit; that the first fraction collected from the iron retort comprised everything which had boiled over up to said last-mentioned temperature; that he then first attempted to determine whether the waxy material, having a specific gravity of not less than 1.14, was present and that he found that it was; that he then applied heat to said iron retort up to 950 degrees Fahrenheit, and even beyond this temperature; that at above 950 degrees Fahrenheit there appeared a hard material having a specific gravity of not less than 1.22; that this was "the very last thing that came off the still"; that in making the test, first up to 355 degrees Centigrade, he used a glass retort, for the reason that the city's specifications called for such a receptacle up to said temperature; that the transfer of the residue to the iron retort was made simply as a convenience, for the reason that the glass retort would not stand as high a temperature as would the iron retort; that the process of distillation in the iron retort was but a continuation of the process in the glass retort; that during the process of distillation in the glass retort, up to a temperature of 355 degrees Centigrade, he did not discover "a composition of matter," as stated in the first claim

of the Reilly patent, "comprising a mixture of waxy material * * * having a specific gravity of not less than 1.14, a hard material * * * having a specific gravity of not less than 1.22, and a suitable solvent for said materials"; that he did not *then* discover the respective "compositions of matter" as mentioned in the second, third and fourth claims of the Reilly patent; that, however, "that composition was there" at that time; that "the discovery or the isolation of that composition was determined in the iron retort," and after the process of distillation "had proceeded to the point of 700 degrees Fahrenheit or in excess thereof"; that in the opinion of the witness the Reilly patent is "not predicated upon any particular temperature," but rather "is predicated upon the mixture of certain ingredients," and that the patent covers "a combination of substances developed both prior to 700 degrees and after 700 degrees Fahrenheit with the solvent oils"; that the city's specifications state that after distillation to 355 degrees Centigrade the residue shall be of a waxy nature, but the specifications do not refer to the specific gravity thereof; that he never discovered, prior to his distillation in this iron retort, "a hard, garnet colored product, brittle at 70° F., having a specific gravity of from 1.14 up to 1.22, and which, when cut with a knife, flakes, the cut surface of the material likewise being of a brilliant garnet color," mentioned in the specifications of the Reilly patent; that he discovered that substance in his distillation in this iron retort, which was the very last thing that came off the retort, and at a temperature, above the range of his thermometer, of probably about 1000 degrees Fahrenheit; that in his distillation in this iron retort he also discovered "a dry coke, sponge-like in appearance and which is readily handled," mentioned in said Reilly patent specifications; that this substance was the last thing left in the retort at nearly 1,000 degrees

Fahrenheit; and that if the witness was trying to find an oil that would conform to the city's specifications, he would not deem it necessary to find these substances that were only developed after a distillation above 700 degrees Fahrenheit but he would only make the test in accordance with the city's specifications. On redirect examination the witness stated that the temperature tests in the city's specifications are not in any sense a requirement to determine the chemical analysis of the oil tested, except as far as the content of light or volatile oils.

Carl S. Miner, another expert witness called by complainants, testified in substance that he had been a consulting chemist in Chicago since 1906; that from 1903 to 1906 he was research chemist and assistant chief chemist of the Corn Products Company; that he is experienced in determining the chemical constituents of various materials, has frequently testified as an expert in patent causes on chemical questions, and has often given advice to clients as to the meaning of patent specifications and whether or not said clients could do certain things without infringement; that he is familiar with the Reilly patent; that he was present in the laboratory of Mr. Kirschbraun in January, 1918, when some creosote oil was tested; that the test then made was a proper one to determine the constituency of said oil, and whether or not the oil met the city's specifications and whether or not the same showed the ingredients as claimed in the Reilly patent; that the test was divided into two sections; that the first consisted in the distillation up to 355 degrees Centigrade, and was conducted in conformity with the city's specifications; that the second consisted in the distillation from an iron retort of the fraction remaining, and that the fractions separated during this latter distillation showed one fraction with a specific gravity in excess of 1.14 and another with a specific gravity of 1.22;

that the test showed that the oil conformed to the city's specifications; that the test also showed that said oil contained the materials as described in claims 1, 2 and 3 of the Reilly patent, and that the description of the composition of matter in said three claims was a correct description of the sample of oil tested.   On cross-examination the witness testified in substance that the waxy material and the hard material, mentioned in said claims of said patent, were contained in the sample of oil tested when the temperature had only reached 355 degrees Centigrade (671 degrees Fahrenheit), but that said materials, as such, could not be *seen* until the temperature had exceeded 700 degrees Fahrenheit; that in making said test he "took and put those things together and then took them apart again"; that he took out the waxy substance and the hard substance, "had them in his hands and examined them and determined their nature, and then put them together again and went through the whole procedure again and got them out again"; that at the temperature of 355 degrees Centigrade said materials "were then in different form, just as sugar dissolved in coffee is different from sugar"; and that during the test and after the temperature had exceeded 700 degrees Fahrenheit he then, and not before, extracted "this waxy material, orange in color," and this "hard, garnet colored product," and the "dry coke."   The witness produced a sample of oil (introduced in evidence) which he stated "we put together from the products of the tar that we distilled"; that it contained "the light distillates and the heavy distillates, the waxy and brittle materials, all combined into one liquid product"; that "we got these elements from both distillations" (glass retort and iron retort), and "mixed them together again and this is the product remade"; that it has "substantially the same physical appearance as the original oil"; that "this sample contains the hard substance, the

brittle substance of the patent, in the form in which they appear in the oil."

On behalf of the defendants, on said question whether the city's specifications specified an oil which infringes the Reilly patent, Peter C. Reilly, the patentee and president of said Republic Co., testified that the substances mentioned in his patent "are in the tar in the retort," at the time when the distillation necessary to furnish the oil under the city's specifications is stopped; that said substances are not "by the specification" in the Chicago oil "either in solution or chemical combination or otherwise"; that the Chicago oil requires a pure coal tar distillate of certain prescribed gravities and distilling points, and that he could add some of his patented oil to the Chicago oil and yet keep within those limitations; and that in his opinion "the Chicago oil is not his patented oil." His opinion, however, was not supplemented by any laboratory tests or by any reports based thereon. The testimony of the expert witnesses for the complainants, Kirschbraun and Miner, was not otherwise attempted to be rebutted by other witnesses, except as hereinafter mentioned. Mr. Eaton, the city chemist, who was present by agreement at the time of the making of the two tests, was not called as a witness by the defendants. Mr. Howard F. Weiss, an expert witness for defendants, testified in substance that he was asked by Mr. P. C. Reilly to testify in this cause and that he was retained in September, 1917; that he is connected with the Burgess Laboratories at Madison, Wisconsin; that in October, 1917, he wrote letters to a number of gas works in various cities in Wisconsin, Minnesota and South Dakota, asking for a gallon sample of the coal tar which they produced, and that in response he received by express twelve different samples, one of which came from Berlin, Wisconsin; that in November, 1917, he distilled at said Burgess Laboratories a portion of

said sample received from Berlin, Wisconsin, in the presence of one of his assistant chemists and Mr. T. W. Smith, chemist of said Republic Co.; that said sample came in a can, uncertified, but identified by a paster of the express company, giving the place from which it came and the name of the shipper; that he also distilled portions of the other eleven samples in a similar manner; that in distilling this coal tar he used a glass flask and ran the heat up to 698 degrees Fahrenheit; that he collected the creosote oil that came over from the still into a glass flask; that when he tested the distillate he wanted to determine "whether there would be a five per cent tar acid content in the particular fraction, 250 to 315 degrees Centigrade"; that he also wanted to determine "how the fractions came off, but particularly this tar acid clause which he understood *was the joker in the Chicago specifications,* and this stop test, and whether the residue was soft and waxy"; that at the time of the test he had before him the Chicago specifications, but that only in certain respects did he attempt to follow them, viz., as to tar acids, spot test, residue and distillation limits; that he "did not note the specific gravity of the residue," and does not know what it was; that although he knew that the Chicago specifications called for a certain specific gravity of the residue, he did not determine that feature; that this was an important feature therein and he knew that a residue that did not meet said specifications in that respect would fail to come within said specifications; that in making his creosote oil he did not use all of the fractions distilled from the tar but discarded certain portions, viz., the lighter or lower boiling portions; that he thinks it would be necessary to examine the specific gravity of the residue, in order to find if the oil infringed the Reilly patent, claim 3, but that he did not do it; and that, therefore, he cannot say, only to his own satisfaction, whether the creosote

oil which he made infringed the Reilly patent. It is thus seen that the witness, Weiss, did not test any sample of Chicago oil and determine whether or not it infringed the Reilly patent, and did not express any definite opinion on that question.

William B. Murphy, another expert witness for defendants, testified in substance that he is the chemist of the F. J. Lewis Company of Chicago, manufacturers of coal tar products on a large scale, and which company has other plants at Birmingham, Alabama, and New Orleans, Louisiana; that about 4 years ago and again recently, about January 7, 1918, he made tests of a composite sample of coal tar received from various sources; that he made these tests to determine whether the distillate of said coal tar would, from 250 to 315 degrees Centigrade, produce certain percentages of tar acids; that he does not know the particular sources from which said coal tars came; that he made the tests according to the city's specifications but that he made no tests with reference to the Reilly patent.

While defendants' witness Reilly, the patentee, was on the stand and was being cross-examined, and just after he had testified that "the patented oil does not meet the Chicago specifications,—some portions of it could be added to the Chicago specifications without impairing the specifications in gravity, but if I were to use it all I would be beyond the Chicago specifications," he was asked by the court: "Do I understand you, if any one sees fit to bid on the Chicago specifications, enter into a contract under said specifications and fill that contract, that you, the owner of the patent, say here publicly to them, in court, that their so doing is not a violation of your patent?" To this question the witness answered: "Absolutely." Whereupon the court said: "All right. Then, for the purpose of this case, * * * he is absolutely estopped for all time to come." Whereupon counsel for com-

plainants said: "The question of estoppel does not answer the objection that there is a menace here of a patent."

On the question whether the city's specifications tend to foster a monopoly in the manufacture of creosote oil and creosoted wooden paving blocks, the complainants introduced the testimony of four expert witnesses. Walter Buehler, engineer of the Barrett Company and a specialist in wood preservation; said Lester Kirschbraun; Harold N. Newton, general manager of the Midland Creosote Company; and M. R. Walczak, chief chemist of said Barrett Company. Complainants also called as witnesses E. B. Fulks, vice president of the American Tar Products Company, and Frank W. Cherrington, chief engineer of the Jennison-Wright Company, of Toledo, Ohio. And it was stipulated, in order to prevent delay in the trial, that three witnesses for complainants, if present, would testify to certain facts, namely, J. B. Stocking, vice president of the Central Creosoting Company of Chicago; Grant Shipley, of the Ohio Wood Preserving Company; and G. W. Fry, of the Compressed Wood Company of Cincinnati, Ohio. The stipulated testimony of these three witnesses was to the effect that they each had applied to the Barrett Company, the American Tar Products Company, the Lewis Company and other distillers of creosote oil, to furnish oil which would meet the Chicago specifications and that each had been unable to procure such oil from said companies or other distillers. The witness Fulks testified that his company, American Tar Products Company, is a distiller of tars and is the second in size in the United States, the Barrett Company being the largest; that the various plants of his company receive coal tars from various sections of the country; that the Milwaukee plant of his company is the nearest plant to Chicago; that his company had received no orders for

Chicago contract oil, that it has had inquiries from customers for said oil but has never supplied any of it, and that his company has none of said oil. The witness Cherrington testified that his company is in the business of creosoting timbers and wooden paving blocks; that he is familiar with the Chicago oil specifications for such blocks; that his company is now furnishing 'creosoted bridge timbers for the City of Chicago but that the oil specified for such timbers is not the kind of oil called for by the city's specifications for paving blocks; that his company has not furnished any paving blocks for Chicago which are creosoted according to said city's specifications; and that he does not know where to secure the oil which will comply with said specifications. It was conceded on the trial by counsel for the city that the ordinance "covers more oils than the specifications" and that the "ordinance is broader than the specifications." The testimony of complainants' four expert witnesses and other witnesses showed that clause 6 (tar acid clause) of the specifications tends to restrict the amount of oil available under the contract as compared with that available under the ordinance; that the average coal tar creosote oil contains less than 5 per cent of tar acids in the particular fraction of the distillate mentioned in said clause, or about 3 per cent; that said requirement of 5 per cent shuts out many of the large producers of coal tar; that there could be a pure distillate of coal tar without reference to the 5 per cent tar acid content in the particular fraction; and that said clause is not in itself of any particular value as a preservative of the wood, and is not in itself a protection against adulteration of the oil with petroleum products. One of the expert witnesses called by defendants, William B. Murphy, chemist of the F. J. Lewis Company, large distillers of coal tar, testified that while his company could probably produce oil required

by the city's specifications in commercial quantities, it had not done so because of the tendency to "burn out the stills" as the company's plant was at present equipped.

At the conclusion of the hearing in the Circuit Court the learned chancellor, in dismissing complainants' bill for want of equity delivered an oral opinion (which is contained in the transcript of the record) giving his reasons for such action. He said that the questions involved seemed to be questions of fact rather than of law; that he did not think there was any question about the law that, where an ordinance or the specification under an ordinance prescribed a patented article, or an article which from the nature of things must necessarily be under the control of one person, or an article of which there is necessarily a monopoly, such ordinance or specification is void; and that the two questions of fact in the case were (1) whether or not the specifications in question infringed the Reilly patent, and (2) whether or not said specifications tended to create a monopoly. He reached the conclusions that the Chicago oil, as specified by said specifications, did not infringe the Reilly patent, and that said specifications did not tend to create a monopoly.

GEORGE A. MASON and WILLIAM T. HAPEMAN, for appellants; DWIGHT B. CHEEVER and HENRY E. MASON, of counsel.

SAMUEL A. ETTELSON, for appellees; CHESTER E. CLEVELAND, GEORGE P. FOSTER and OTTO W. ULRICH, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

The main question in this case is: Do the city's specifications tend to restrict free competition among

bidders, in violation of section 74 of the Local Improvements Act (J. & A. ¶ 1466)? This main question is to be determined, as it seems to us, by the decision of either one of two questions of fact, viz.: (1) Do said specifications prescribe a creosote oil which cannot be made without infringing the Reilly patent, No. 1,220,001, issued March 20, 1917? (2) Do said specifications tend to foster a monopoly in the manufacture of creosote oil and creosoted wooden paving blocks?

If said specifications prescribe a creosote oil which cannot be made without infringing said Reilly patent, the validity of which patent is not questioned, we think that any contract based thereon is void.

In *Siegel v. City of Chicago*, 223 Ill. 428, it is decided that, under section 74 of the Local Improvements Act (J. & A. ¶ 1466), a municipal corporation cannot prescribe in the ordinance for a special assessment improvement the use of a patented article or material which can be obtained from only one person, firm or corporation, even though the latter agrees to furnish the same to any bidder on the contract at a fixed price. The vice in specifying a patented article in an ordinance is that it tends to restrict free competitive bidding. In *Fishburn v. City of Chicago*, 171 Ill. 338, it is decided that if the ordinance does not show, on its face, that the article specified is patented or controlled by a single owner that fact may be proved. The above decisions were followed in the case of *Village of Rossville v. Smith*, 256 Ill. 302, 305. And we are unable to see any difference in principle between a case where the ordinance specifies a patented article, and a case where the specifications under the ordinance specify such an article. And we think that a court of equity has jurisdiction to restrain the performance of a contract which tends to restrict competitive bidding or which is otherwise illegal or void. (*Loeffler v. City of Chicago*, 246 Ill. 43; *Stevens v. St. Mary's Training*

*School,* 144 Ill. 336; *Holden v. City of Alton,* 179 Ill. 318; *City of Chicago v. Hanreddy,* 211 Ill. 24.)

In the *Rossville* case, *supra,* the ordinance specified a pavement to be paid for by special assessment. The ordinance did not in terms prescribe the use of a patented article, but evidence was introduced to show that the pavement described could not be constructed without infringing a certain patent. The trial court overruled the objections and entered judgment of confirmation, which judgment the Supreme Court reversed, and remanded the cause with directions to sustain the objections. In the reported opinion of the court the specifications for the wearing surface are set forth, as are also portions of the specifications of said patent, the validity of which patent was not questioned. The question to be decided was whether the materials, treated as required by the specifications of the ordinance, would produce the patented pavement. From said opinion it appears that the objectors called as a witness an experienced chemical engineer. He testified to the results of a laboratory test made by him, and that the proportion of the different grades of stone, sand, dust and asphalt specified in the ordinance was substantially the same as in said patent, and that the pavement produced would be an infringement of said patent. The court (p. 311) says:

"This testimony clearly shows an infringement, and it was not met by the testimony of appellees. No attempt was made to show any other laboratory test, or to show that the voids in a pavement constructed according to the specifications would not be less than 21 per cent or that the pavement would not have inherent stability. Three witnesses were examined on behalf of the appellee, and were of the opinion that the pavement could be constructed in accordance with the specifications without infringing the patent. * * * Evidence was given that the amount bid for the contract was reasonable, but such evidence was immaterial.

The ordinance, because it prevented competition, was not within the power of the council to pass.''

The analogy between this *Rossville* case and the present case is somewhat striking. In the *Rossville* case it appeared that the pavement could not be constructed without infringing the two basic elements of the patent, viz., inherent stability and less than 21 per cent of voids. These elements were not in terms mentioned in the ordinance yet it appeared from the proof that the ordinance pavement would contain them. In the present case the specifications do not mention the products described in claims 1, 2 and 3 of the Reilly patent, which are the basic elements thereof, yet it appears from the testimony of complainants' expert witnesses, Kirschbraun and Miner, that a pavement cannot be constructed according to the instant specifications without using a creosote oil which contains the products described in said three claims. Both of these witnesses were experienced chemical engineers, accustomed to construe patents and specifications. Kirschbraun had previously been employed for a period of about 3 years by the City of Chicago as a chemist in the asphalt testing laboratory and Miner had frequently testified in patent causes on chemical questions. By agreement between counsel for complainants and counsel for the City of Chicago, two samples of the Chicago oil, as described in the instant specifications, were delivered to Kirschbraun for the purpose of his making tests thereof, on condition that Mr. Eaton, chemist for the city, be present at such tests. Two tests were made,—the first by Kirschbraun in the presence of Eaton, and the second by Kirschbraun and Miner in the presence of Eaton. Both Kirschbraun and Miner testified that the samples of oil they tested conformed with the oil as described in the instant specifications and that the products mentioned in claims 1, 2 and 3 of the Reilly patent were

present in the samples of oil tested by them.    There was read to each of these witnesses the exact wording of said three claims and each testified that the description in each of said claims correctly described the ingredients of the samples of oil tested by them, and that the "waxy material" and the "hard material," of the specific gravities mentioned, and the "suitable solvent" were present in said samples.    Kirschbraun's original notes of both tests were offered in evidence.    And both Kirschbraun and Miner expressed the opinion, based on said tests, that said samples infringed the Reilly patent.    The defendants did not offer any laboratory tests, or reports based thereon, in rebuttal of this testimony.    The chemist for the city, Mr. Eaton, who was present when Kirschbraun and Miner made their tests, was not called as a witness by the defendants to question in any manner the methods used or the results obtained by complainants' experts, and this, we think, is somewhat significant.    On behalf of the defendants, Peter C. Reilly, the patentee and president of the Republic Co. (the paving blocks manufactured and treated by which company, the contractor, Ryan Company, stated in its bid it proposed to use), testified that in his opinion "the Chicago oil was not his patented oil." The witness, Weiss, although it appears he made certain tests for certain purposes of samples of oil received from various gas works, did not test any sample of the Chicago oil and did not express any definite opinion as to whether or not the same infringed the Reilly patent.    And the witness, Murphy, never tested any sample of the Chicago oil with reference to the Reilly patent.    It thus appears that Mr. Reilly, the patentee, was the only witness for the defendants who expressed an opinion on the question of infringement contrary to the testimony of complainants' witnesses, Kirschbraun and Miner, and his opinion is unsupported by any laboratory tests of the Chicago oil, or by any

reports based thereon. We do not think that his unsupported opinion should prevail over the testimony and opinions of said witnesses for complainants. In the *Rossville* case it seems that the court gave greater weight to the testimony and opinion of one witness, based upon facts disclosed from a laboratory test, than to the contrary unsupported opinions of three witnesses.

In some cases chemical or laboratory tests are necessary to determine questions of infringement of the claims of a patent. This clearly appears in *Byerley v. Sun Co.*, 181 Fed. 138; 184 Fed. 455; *Byerley v. Barber Asphalt Paving Co.*, 230 Fed. 995; *Kuehmsted v. Farbenfabriken of Elberfeld Co.*, 179 Fed. 701, 705; *General Bakelite Co. v. Nikolas*, 225 Fed. 539, 555; *General Electric Co. v. Laco-Philips Co.*, 233 Fed. 96, 97. We think that this is such a case. The above citations also disclose that infringement cannot be avoided because tests are necessary to determine infringement. And we think that any method of test may be employed which will fairly determine the question. In the present case it was shown by complainants' expert witnesses, Kirschbraun and Miner, that the method they used in testing the Chicago oil was a sufficient and proper method to determine the presence therein of the patented ingredients mentioned in claims 1, 2 and 3 of the Reilly patent, and that said ingredients were in said oil. On the trial counsel for defendants made no direct attack upon the tests made by them, but seemed to assume in cross-examination of said witnesses that the determination of the question of infringement depended upon whether the city's specifications, following only the tests mentioned therein, would produce the products described in said three claims of the Reilly patent, and counsel here base an argument on such assumption. We think the assumption is erroneous. The city's specifications do not

prescribe a method for *producing* oil but only a method for *testing oil* already produced and proposed to be used in a contemplated pavement.   The tests mentioned in the city's specifications were not intended to determine questions of infringement.   While the city's specifications require that the oil submitted shall have certain properties, said specifications do not refer to the patented products, and, as it seems to us, an expert in making tests of the Chicago oil to ascertain whether it infringes said claims of the Reilly patent should not be confined to the tests mentioned in the city's specifications.   If the tests made by complainants' experts had been confined only to the tests set out in the city's specifications, but one thing would have been disclosed, viz., that the oil so tested conformed to the city's specifications.   We think that the tests for infringement must be carried far enough to show the chemical or physical constituents of the oil, and, if by such tests those constituents are found to be the products mentioned in said claims of the Reilly patent, then the patent is infringed.   Furthermore, claims 1 and 2 of the Reilly patent mention no temperature limits.   Claim 3 mentions a temperature "of at least 700 degrees F."   It is the law regarding patents that infringement depends upon a violation of the *claims* of a patent as distinguished from the specifications.   The city's specifications fix the heat limit, to be applied in testing oil to determine whether it meets said specifications, at 355 degrees Centigrade (671 degrees F.). And it appears from the testimony of complainants' experts that the last-mentioned degree of heat will not disclose the Reilly patented products, yet that they are present in the Chicago oil, as can be shown by applying greater heat.

While defendants' witness Reilly, the patentee, was on the stand and was being interrogated by the chancellor, he stated in effect that no prosecution for in-

fringement of his patent would be commenced against any one who saw fit under a contract with the city to furnish the creosoted oil called for by the city's specifications. This statement estops Mr. Reilly. But the menace of the patent remains, and will remain during the life thereof until successfully attacked in a court of competent jurisdiction.

Our conclusion is that the city's specifications prescribe a creosote oil which infringes said Reilly patent, and that said specifications on that account tend to restrict free competition among bidders in violation of section 74 of the Local Improvements Act (J. & A. ¶ 1466), and that the contract of the Ryan Company is void.

On the question whether said specifications tend to foster a monopoly in the manufacture of creosote oil and creosoted wooden paving blocks, we have also reached the conclusion, after a careful consideration of the record before us, that they do so tend.

For the reasons indicated the decree of the Circuit Court will be reversed, and the cause remanded with directions to that court to issue the injunction as prayed in complainants' bill.

*Reversed and remanded with directions.*